**NATIONAL LABOR RELATIONS BOARD**

v.

**NASH–FINCH CO.**

No. 14882.

United States Court of Appeals, Eighth Circuit.

April 13, 1954.

John Francis Lawless, Atty., National Labor Relations Board, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Maurice Alexandre, Atty., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Neil A. Riley, Minneapolis, Minn., for respondent.

Before SANBORN, JOHNSEN and COLLET, Circuit Judges.

SANBORN, Circuit Judge.

The National Labor Relations Board found that the Nash-Finch Company, a wholesaler of food and other products, had, in its dealings with its warehousemen and truck drivers at its plant in Fargo, North Dakota, committed unfair labor practices in violation of § 8(a) (1), 8(a) (3) and 8(a) (5) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq. 103 N.L.R.B. No. 149. The Board has petitioned this Court for the enforcement of its order based upon such findings. The respondent asks that the order be set aside.

The controlling question in the case was stated by the Trial Examiner in his intermediate report as follows:

"The sole issue involved in this case is whether or not hospitalization insurance fully paid, and group life insurance partially paid for, by Respondent and enjoyed by its employees prior to July 26, 1951, together with a Christmas bonus consistently paid in previous years, could be unilaterally cancelled, withdrawn or withheld by Respondent after July 26, 1951, when Respondent and the Union entered into a collective bargaining agreement which made no explicit mention of any of the benefits aforementioned" [1]

The Trial Examiner concluded that, although the agreement did not call for the continuation of the benefits referred to, it was the duty of the respondent not to terminate them without having bargained with the Union with respect to their discontinuance, and that the termination of the benefits was a violation of the organizational rights of the employees contrary to § 8(a) (1) of the Act, a refusal to bargain collectively in violation of § 8(a) (5) of the Act, and an attempt to discourage membership in a labor organization in violation of § 8(a) (3).

The Board accepted the Trial Examiner's findings, agreed with his conclusions, and adopted his recommendations. It ordered the respondent to make its union employees whole for any pecuniary

---

1. The record indicates that the agreement was executed on or about July 23, 1951.

losses which they may have sustained on account of the termination of the insurance benefits until such time as they were restored or the respondent had terminated them after bargaining with the Union in good faith, and to make its employees whole for the withholding of their 1951 Christmas bonus. The Board also ordered the respondent to cease and desist from the unfair labor practices it was found to have committed.

The facts out of which this controversy arose are virtually undisputed. On May 14, 1951, the General Drivers, Helpers, Warehousemen, Dairy Employees and Inside Workers Union, Local 116, A. F. of L., was, at a consent election held by the Regional Director of the Board at the respondent's plant, selected as the collective bargaining representative of "all warehousemen and truck drivers employed at Respondent's Fargo, North Dakota, plant, excluding office and clerical employees, watchmen and guards, professional employees, and supervisors as defined in the Act." The Board, on May 21, 1951, certified the Union to be "the exclusive representative of all the employees in the unit * * * for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment."

It had been customary for the respondent to maintain hospitalization insurance and to contribute toward the maintenance of group life insurance for all the employees at its Fargo plant, as well as to pay them a Christmas bonus. Prior to the selection of the Union as their collective bargaining representative, about one-half of the respondent's warehousemen and truck drivers at Fargo had individual contracts of employment with the respondent. During the organizational campaign preceding the election at the plant, the warehousemen and truck drivers were told by the respondent, in substance, that if they selected the Union to represent them the insurance benefits and Christmas bonus would be discontinued.

After the election and certification of the Union as the representative of these employees, the respondent and the Union held their first bargaining conference at respondent's offices in Fargo on June 8, 1951. The Union was represented by Greg Helvig, its Secretary-Treasurer, and Al Stolz, a shop steward. Stolz had worked for the respondent about twenty years and had a typical employment contract which called for hospitalization and group insurance and a Christmas bonus. Stolz was one of those who had heard the statement of the management that the employees would lose their bonuses and insurance if they selected the Union to represent them. The respondent's representatives at the bargaining conference were George B. Wertin, its plant manager at Fargo, and C. W. Ferguson, its personnel director. The Union representative, Helvig, submitted a draft of a proposed contract, which Ferguson said he would have to take to the respondent's main office in Minneapolis for study.

The next bargaining conference was held at Fargo on July 10, 1951. The respondent submitted a counter proposal. The Union's objective was an increase in wages. Tentative agreement as to wage rates as well as a guaranteed work week of 46 hours was reached. The draft of the proposed contract submitted to the respondent by the Union had contained an Article 5 relative to maintenance of standards, reading as follows:

"The Employer agrees that all conditions of employment relating to wages, hours of work, overtime differentials, and general working conditions shall be maintained at not less than the highest minimum standards in effect at the time of the signing of this agreement, and the conditions of employment shall be improved wherever specific provisions for improvement are made elsewhere in this agreement."

At this July 10 meeting, Ferguson referred to this Article as "vague", and was told by Helvig that "what we want to do by that clause is maintain all good

conditions that they [the employees] have had and then from that point work forward and build an agreement in addition to that and improve on other items, which is the purpose of collective bargaining." During the negotiations, Ferguson had referred to the fact that the respondent had had insurance plans for its employees.

The proposed wage rates and work week understanding reached at the July 10 conference was submitted to the Union membership for approval, and was acceptable to them. Thereafter by letter of July 17, 1951, a second draft of a proposed contract was submitted to the respondent by the Union. On or about July 20 Helvig was called by Wertin to come to his office and look over the proposed contract which had been signed by the respondent's President and sent to Wertin for execution. Helvig went over to Wertin's office and obtained a copy of the contract "to look over." The things he was most interested in were the work week and wages. Helvig retained the contract until July 23, when he discussed it with Wertin. They agreed to certain changes as a result of their discussion. Article 5 of the agreement as it was originally proposed by the Union had been amended by the respondent to read as follows:

"5. Maintenance of Standards. The Employer agrees that wages, hours of work, overtime differentials, and general working conditions shall be maintained at not less than the highest minimum standards specified in this agreement and the conditions of the employment shall be improved wherever specific provisions for improvement are made elsewhere in this agreement.

"It is agreed that the provisions of this section shall not apply to inadvertent or bona fide errors made by the employer or the Union in applying the terms and conditions of this agreement if such error is corrected within ninety (90) days from the date of error."

There was no discussion of Article 5 as amended, and no further change was made in it. Helvig signed the agreement on behalf of the Union effective from June 1, 1951, to May 31, 1952.

The respondent and the Union bound themselves by the agreement to abide by its terms and provisions, which covered in detail rates of pay, wages, hours of employment and other conditions of employment, including coffee time. It contained no provision requiring the respondent to maintain insurance or to provide a Christmas bonus for the employees represented by the Union. The respondent, after the execution of the agreement, terminated the hospital and group insurance benefits of these union employees. It paid no 1951 Christmas bonus to such employees. Hospital and group insurance benefits and Christmas bonuses were not discontinued as to the respondent's non-union employees at Fargo. They, on the other hand, had not received the wage increases provided for by the agreement negotiated by Helvig on behalf of the Union employees.

In October, 1951, the wife of Stolz required hospitalization, and the wife of Richard Olson, another union employee, gave birth to a baby. Olson found that hospitalization insurance had been terminated. These employees talked to Helvig, and he wrote the respondent at Minneapolis demanding reinstatement of the insurance benefits, but without avail.

Helvig filed a charge against the respondent on December 6, 1951, based on the discontinuance of insurance protection for Union members. The first amended charge was filed May 14, 1952, shortly before the expiration date of the collective bargaining agreement which Helvig had negotiated. The record does not show when the complaint of the General Counsel of the Board was filed. It was evidently after the term of the July 23, 1951, agreement had ended, for the notice of hearing was dated July 2, 1952, and the hearing on the complaint was set for August 4, 1952.

The Board stated its position in its decision, in part, as follows:

"It is Respondent's contention that a contract which it entered into with the Union on July 23, 1951, and the events preceding the signing of that contract, spelled out a waiver or acquiescence by the Union in the elimination of the benefits. Like the Trial Examiner, we find this contention to be without merit. Viewed in the light most favorable to Respondent, the facts establish no more than an agreement on the part of the Union that Respondent be free of any *contractual* obligation to maintain the benefits for the duration of the contract. Respondent thus assumes that a union's willingness to forego contractual obligation by the employer to maintain certain existing working conditions must also be viewed as a grant of permission by the union to the employer to alter those conditions without consulting it or bargaining collectively about them. We see no justification for such an assumption. A union might well be willing to concede the former without being willing to concede the latter."

The Board also said:

"We therefore find, as did the Trial Examiner, that elimination of life insurance, hospitalization, and Christmas bonus was not fully discussed or consciously explored preliminary to the signing of the July 23, 1951 contract and that the Union's signing of this contract did not constitute a waiver of its statutory right that Respondent bargain with it regarding any changes in these conditions of work."

The Board concluded that the respondent's discontinuance of the benefits not called for by the contract was motivated by its hostility toward the Union and was a violation of § 8(a) (5), (3) and (1) of the Act.

We consider untenable the position of the Board that, although the respondent had assumed no contractual obligation to continue the insurance and bonus benefits which it had formerly provided for the employees represented by the Union, the respondent was obligated by law to continue such benefits unless and until it terminated them after further bargaining with the Union.

Both the Union and the respondent in their bargaining were negotiating for an agreement completely covering the obligations of the respondent toward its union employees during the period June 1, 1951, to May 31, 1952. The question of maintenance of the insurance and bonus benefits was not ignored in the negotiations between the parties to the agreement. The Union in the first draft of a proposed contract had inserted a "Maintenance of Standards" provision which would have required the respondent to maintain its insurance and bonus plans for its union employees. This provision, however, was unacceptable to, and was not accepted by, the respondent.

■ Where parties to a contract have deliberately and voluntarily put their engagement in writing in such terms as import a legal obligation without uncertainty as to the object or extent of such engagement, it is conclusively presumed that the entire engagement of the parties and the extent and manner of their undertaking have been reduced to writing. Ford v. Luria Steel & Trading Corp., 8 Cir., 192 F.2d 880, 884 and cases cited.

The following language from Printing &c. Co. v. Sampson, L.R. 19 Eq. 462, 465, has several times been approved by the Supreme Court of the United States: " * * * if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice." See Baltimore & Ohio S. W. R. Co. v. Voigt, 176 U.S. 498, 505, 20 S.Ct. 385, 387, 44 L. Ed. 560; Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 356, 51 S.Ct. 476, 75 L.Ed. 1112.

The respondent, we think, may not be convicted of an unfair labor practice for doing no more and no less for its union employees than its collective bargaining agreement with them called for. "And it is * * * clear that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." National Labor Relations Board v. American National Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027. Whether the contract in suit should have contained the clause proposed by the Union requiring the maintenance of existing standards of employment, was "an issue for determination across the bargaining table, not by the Board." At page 409 of 343 U.S., at page 832 of 72 S.Ct.

It seems to us that what the Board has done, under the guise of remedying unfair labor practices, is to attempt to bestow upon the respondent's union employees the benefits which it believes the Union should have obtained but failed to obtain for them as a result of its collective bargaining with the respondent on their behalf.

Our conclusion is that the Board is not entitled to the enforcement of its order. Its petition for enforcement is denied.