**INTERMOUNTAIN EQUIPMENT COM-PANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 15035.

United States Court of Appeals Ninth Circuit.

Dec. 27, 1956.

Thomas L. Smith, Boise, Idaho, Louis H. Callister and Nathan J. Fullmer, Salt Lake City, Utah, for petitioner.

Theophil C. Kammholz, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Fannie M. Boyls, Nancy M. Sherman and Arnold Ordman, Attys., N. L. R. B., Washington, D. C., for respondent.

Before DENMAN, Chief Judge, CHAMBERS, Circuit Judge, and MURRAY, District Judge.

DENMAN, Chief Judge.

The Intermountain Equipment Company, hereafter the Company, petitions for review of an order of the National Labor Relations Board, hereafter the Board, requiring the Company to cease and desist from certain practices which the Board found violated Section 8(a) (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (3), and to make whole certain employees for losses occasioned by such practices. In a cross petition, the Board seeks enforcement of its order.

It is conceded that the Company is engaged in interstate commerce. It operates establishments in Idaho and Washington, and annually purchases and sells equipment in other states which is valued at more than $3,000,000. The present dispute arises from its operation of

its warehouse in Boise, Idaho, where it employs approximately 65 persons.

Prior to 1953, the year in question, the Company had for a number of years made annual bonus payments to its employees, although it had no formal policy respecting bonuses. While the payment of bonuses depended on the financial condition of the Company, in practice, the Board found, an employee who had been working for the Company for a year might reasonably expect to receive a bonus in the amount of about one month's pay.

Similarly with regard to sick leave, the policy of the Company had not been clearly defined, but in practice employees who were absent because of illness did not suffer a loss of pay. The matter appears generally to have been left to the discretion of the department heads.

On June 23, 1953, Local 483, of the General Teamsters, Warehousemen and Helpers, was certified by the Board as the collective bargaining agent for the employees of the parts department of the Company's Boise establishment which employed about 14 men. In July, 1953, the Company and the Union entered into collective bargaining negotiations. As a result of these negotiations, the members of the union received some substantial benefits: (1) an hourly wage increase averaging about 26¢; (2) six annual holidays with pay; (3) overtime for over eight hours work in any one day or more than 40 hours in any one week; (4) guaranteed paid vacations; (5) time and one half for work done on holidays, and a provision that holidays not worked should count as time worked for the purpose of computing weekly overtime; (6) union security provisions (union shop), seniority provisions, and grievance processing machinery. Employees outside the bargaining unit did not receive the benefit of any of these provisions. The contract contained no provision concerning either bonuses or sick leave, and it is in connection with these benefits that the present case arises.

When the question of sick leave was raised at the contract negotiations, the Company opposed the inclusion in the contract of a fixed sick leave period on the ground that it would encourage employees to malinger by taking the full period allowed whether they were sick or not. The Company representative, Dufford, inquired whether the employees were dissatisfied with the way the Company had handled sick leave in the past. The union representatives stated that the company's past conduct in this regard had been satisfactory. Dufford gave the union representatives to understand that he saw no reason why the policy of the past should not be continued into the future, and that there would be no discrimination as to sick leave between members of the bargaining unit and other employees.

Similarly when the question of bonuses was presented, Dufford resisted the inclusion of any bonus provision in the contract on the ground that the payment of bonuses was a prerogative of management. The union did not press for a bonus provision because of what it interpreted as an assurance from Dufford, that if bonuses were paid there would be no discrimination between union members and other workers outside the bargaining unit.

After the contract was signed at the end of July, 1953, the Company installed time clocks for union members only and paid them only for work time shown on the clock. The result was that union employees did not receive any sick leave. In December, 1953, the Company, without notifying the union, paid bonuses to employees not in the bargaining unit, but denied them to members of the bargaining unit. In January, 1954, the union filed a complaint against the Company with the Board.

The issue is whether by denying sick leave to members of the bargaining unit of the union during the period of the 1953 contract, and by paying bonuses in December, 1953, to all employees except members of the bargaining unit, the Company committed an unfair labor

practice under Section 8(a) (3). Section 8(a) provides in material part:

"It shall be an unfair labor practice for an employer—

\* \* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*."

The theory of the Board is that by discriminating against members of the bargaining unit in regard to sick leave and bonuses the Company did discourage membership in the union in violation of this section. In reaching this result the Board disclaims any reliance on a collateral contract between the Company and the union in regard to these benefits arising from the alleged assurances of the Company representative, Dufford, that there would be no such discrimination, and that the Company would extend its past policies as to both these benefits into the future. The trial examiner found "that no collateral oral agreement, in the legally enforceable sense, was in fact intended or made." He further found that there was no refusal to bargain as to these matters by the Company in violation of Section 8(a) (5) of the Act.

The Board thus concedes that sick leave and bonuses were left by the union as the prerogative of the Company. Although the Board agrees that there was no contract concerning these benefits between the parties, its brief repeatedly emphasizes the "Assurances" made to the union by the Company, and it is clear that the statements by Dufford at the negotiations constitute the principal circumstance which lead the Board to find a violation of Section 8(a) (3).

Several cases are offered by the Board in support of its contention that the action of the Company in changing its policies in regard to certain benefits left by the union to Company discretion in the presence of a "gentlemen's agreement" not to make such changes violates Section 8(a) (3). In General Motors Corp. v. N. L. R. B., 3 Cir., 1945, 150 F.2d 201, it was held that the transfer by the Company of employees who were represented by the union from a salary to an hourly wage pay system, while employees doing the same work remained on a salary basis, constituted conduct calculated to discourage union membership. In Radio Officers' Union, etc. v. N. L. R. B., 1954, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455, discriminatory treatment by which employees who were members of the union were given back pay benefits which were denied to identically situated employees who were not union members, was held to be unlawful on the ground that it tended to encourage union membership.

Both the above cases are distinguishable from the present case because here the union employees had obtained substantial benefits which had not accrued to the non-union employees who were not covered by the contract, and the non-union employees who received the benefits denied union members were outside the scope of the bargaining unit; the General Motors and Radio Officers' Union cases, on the other hand, involved discrimination among employees doing exactly the same work for exactly the same pay solely on the basis of union membership.

In Allis-Chalmers Mfg. Co. v. N. L. R. B., 7 Cir., 1947, 162 F.2d 435, 440, also cited by the Board, the company had demoted and reduced the wages of a group of employees immediately after they had selected the union as their bargaining representative. The court stated that such acts clearly tended to discourage union membership in violation of the act. In the present case, however, the union employees had received substantial benefits vis-a-vis non-union employees, and all that they were denied was benefits expressly left to the discretion of the Company.

In Armstrong Cork Co. v. N. L. R. B., 5 Cir., 1954, 211 F.2d 843, also so cited, the Company, which had previously arranged a wage increase for all its em-

ployees, changed its plans as to its machinists who had designated a union as their representative. The union had previously informed the company that it would permit no unilateral changes in working conditions. The court held that the act of the company discriminated against the members of the union. The case is clearly distinguishable from the present facts because here the union had expressly left the benefits in question to the discretion of the employer.

Thus these cases fail to establish a basis for the Board's conclusion that the assurances of the employer, which the Board has found did not constitute a contract between the parties, will support a finding of discrimination against union members, particularly where the union members had received benefits which non-union members did not. It should be noted that under the statute mere discrimination among employees is not an unfair labor practice; it is only where the discrimination encourages or discourages union membership that an unfair labor practice occurs. While such a purpose on the part of the employer may be inferred from the circumstances, the only circumstance here tending to show such discrimination is the denial of certain benefits which the union had not bargained for on behalf of the members of its bargaining unit. As pointed out above, the cases cited by the Board do not support the conclusion that on the facts of this case, discrimination having the purpose of effect of discouraging union membership is shown. To the contrary, as suggested by the Chairman of the Board in his dissenting opinion, that the employer here acted from no anti-union motivation is shown by the substantial benefits obtained by the union under the contract for itself in the form of the union security provision and for its members in a wage increase, paid holidays and other benefits.

The case most closely resembling the facts of the present case is against the Board's position. This decision is N. L. R. B. v. Nash-Finch Co., 8 Cir., 1954, 211 F.2d 622, 45 A.L.R.2d 683. In that case the employer had previously carried group hospitalization insurance for all its employees, and had paid them all Christmas bonuses; after the union entered into a collective bargaining agreement with the employer which made no mention of these benefits, the employer discontinued them as to the members of the bargaining unit. The Board seeks to distinguish that case on the ground that the union had bargained away these benefits in exchange for wage increases, and agreed to the contract with notice that the employer intended to withdraw them. Examination of the contentions of the Board in that case, however, does not support this view. There the Board contended that the union by failing to include these benefits in the contract had not waived its rights " 'regarding any changes in these conditions of work' " quoted at 211 F.2d 626. Nevertheless, the court held that the failure to include these benefits in the contract was conclusive and that the Board could not later seek to obtain for the union members what the union had failed to obtain in bargaining. It is difficult to distinguish that case from the present where the union left the benefits in question to the discretion of the employer, albeit in reliance on an assurance as to the manner in which the discretion would be exercised.

The words of the court in the Nash-Finch case appear applicable here:

"The respondent [the Company], we think, may not be convicted of an unfair labor practice for doing no more and no less for its union employees than its collective bargaining agreement with them called for. 'And it is * * * clear that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.' National Labor Relations Board v. American National Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027. Whether the contract in suit should have contained the clause

proposed by the Union requiring the maintenance of existing standards of employment, was 'an issue for determination across the bargaining table, not by the Board.' At page 409 of 343 U.S., at page 832 of 72 S.Ct." 211 F.2d at page 627.

The Board's petition for the enforcement of its order is denied and the order is set aside.