### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### LEWIN-MATHES COMPANY, Division of Cerro De Pasco Corporation, Respondent.

#### No. 13051.

United States Court of Appeals Seventh Circuit.

Dec. 19, 1960.

Rehearing Denied Jan. 19, 1961.

**330**

Marcel Mallet-Prevost, Assistant Gen. Counsel, Duane B. Beeson, Atty., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marion L. Griffin, Atty., N. L. R. B., Washington, D. C., for petitioner.

Milton O. Talent, St. Louis, Mo., Moller & Talent, St. Louis, Mo., for respondent.

Before HASTINGS, Chief Judge, SCHNACKENBERG and CASTLE, Circuit Judges.

CASTLE, Circuit Judge.

This case is before the Court on the petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq.), for enforcement of its order issued against respondent on

March 4, 1960. This Court has jurisdiction, the acts asserted to be unfair labor practices having occurred at respondent's plant in Monsanto, Illinois, where respondent is engaged in smelting, refining, and fabricating ores and metals for interstate commerce.

Shortly after certification of United Independent Electrical Workers of America [1], United requested negotiations with Respondent. Negotiations were had and 14 meetings between United and Respondent, extending over a period of six months, were held. The first being held on December 27, 1957 and the last being held on June 10, 1958.

At the first meeting United submitted to Respondent proposals in the form of a complete proposed collective agreement containing a number of articles. In this contract proposal United submitted a recognition clause which varied somewhat from the unit description in the certification and read as follows:

> "The Company hereby recognizes the Union as the sole and exclusive bargaining agency for all the Company's employees employed as maintenance electricians of all classifications, in accordance with the NLRB certification of representation, Case No. 14–RC–3212, dated December 2, 1957, but excluding all office clerical employees, professional employees, guards, watchmen and all supervisors."

United then in the same article defined employee to apply to all employees who perform electrical maintenance work.

United at the opening of the first meeting raised the question of the assignment of work. At the first 4 meetings through the January 14 meeting, the parties negotiated on the basis of the intent of United's proposals and reached some understanding and agreement on principles involved in parts of the proposal. During those early meetings, Respondent complained that United took an incon-

---

1. Hereafter called United. United Steelworkers of America, AFL–CIO, hereinafter called Steelworkers, was bargaining representative for all other production and maintenance employees at the Company's Monsanto, Illinois, plant.

sistent position on seniority and complained about the looseness of the language in United's proposals. However, there had been several tentative agreements reached on certain proposals. At the January 14 meeting Respondent indicated that it would submit counterproposals which would include areas of agreement together with Respondent's counterproposals. At the next meeting on January 21, 1958, Respondent submitted a counterproposal intended to incorporate all subjects of discussion agreed upon in previous sessions and, like that of the original Union proposal, was in the form of a proposed collective bargaining agreement set up with article headings and sections under each article.

United and Respondent then proceeded to go through the counterproposal and discuss its various sections, this procedure being followed through meetings of January 21 and 24. United was concerned about the effect of Article V, Section 1, the seniority clause of the Respondent's counterproposal, whereupon at the January 29 meeting Respondent submitted a new proposal on seniority which made the length of service within the unit as the standard of seniority.

The matter of wages and duration of the contract were deferred by agreement until all other matters had been settled. The most serious disagreement during the negotiations was the assignment of work clause.

United was insisting that its work jurisdiction had to be defined. The problem of assignment of work was always tied in with the discussions on the management clause and the work jurisdiction clause. The record shows that there had been numerous jurisdictional disputes in the plant about the assignment of work as between the electricians, millwrights and others in the maintenance department. Respondent advised United that it was in the midst of an arbitration with the Steelworkers over the meaning of a subcontract clause which United had submitted and explained the problems attendant thereon. Respondent pointed out that in most of the cases there would

be no problem about the assignment of work, but that there was a "gray" area where there was considerable conflict.

United's objections to the preservation by management of the right of assignment was based on a fear by United that management would either destroy the unit or discriminate against members of the unit. Respondent attempted to reassure United that in most of the cases there would be no problem about the assignment of work but that there was a "gray" area where there was considerable conflict because of which Respondent contended it had to retain the right to assign. United submitted a recognition clause which varied from the description of the unit as it appeared in the Board's certification. The Respondent at the January 21 meeting submitted its counterproposals. One was a provision which attempted to adhere to the Board's description of the certified unit. The only difference between the parties was whether the clause should contain "classified as electricians" or "maintenance electricians of all classifications". This matter was disposed of at the January 29 meeting, and thereafter there was no question as to the description of the scope of the unit. Early in the negotiations, United offered to use $2.52½ and $2.72½ as a wage basis from which to negotiate.

The last negotiating meeting prior to the strike was on April 7. At this meeting the matter of the assignment of work, management rights and of work jurisdiction were the subjects on which an impasse had been reached and on which the strike was called. On April 21 United commenced a strike. United threw up a picket line, but the picketing was ineffective in shutting down the plant. On or about April 30 Respondent sent a letter to all strikers advising them that it would consider replacing them and indicated that it would wait until May 8, 1958 until it took any action. A copy of this letter was sent to United. Shortly after May 8, 1958 Respondent instructed its personnel and engineering departments to attempt to obtain replacements.

It was reported to Respondent that no success was being had because the rate of pay was too low. Toward the end of May, 1958, after trying unsuccessfully for approximately three weeks to obtain replacements from the outside, Respondent decided to attempt to obtain replacements from within the maintenance group represented by the Steelworkers in the plant. Some 10 or 12 candidates were proposed by the representative of the Steelworkers providing they would not receive a cut in pay and would be reassured that they could return to the Steelworker's unit without loss of seniority, if they did not make the grade in the electrical unit. The names were screened by the engineering department and 7 applications were approved. Respondent agreed that these replacements would receive $2.52½ an hour and further agreed to provide safeguards so that these men could return to the Steelworker's unit without loss of seniority. On June 5, 1958 the parties met and a written agreement to that effect was entered into. And, upon request, the men were granted superseniority over any of the strikers that would return. There were 7 men who reported to work as replacements. On June 6 a meeting was had between United and Respondent. United inquired about the replacements and was advised that 7 men had been hired. United was advised that there were still 5 openings and that the strikers could fill the 5 job vacancies. They were advised that the replacements were being paid $2.52½ and had been granted superseniority. They were further advised that there were 5 jobs open at this rate and that United should report this to its members. A negotiating meeting was held on June 10, 1958, at which meeting the parties came to an agreement on distribution of overtime work, premium pay and holiday work. The parties discussed a superseniority clause for the replacements. United, however, refused to represent replacements and Respondent insisted that United would have to represent the replacements and insisted further that there would have to be a clause providing for superseniority for the replacements. United stated that it could not negotiate a contract which recognized the replacements. Respondent stated that it could not negotiate a contract which failed to recognize the replacements, so the negotiations were at a standstill. On or about June 30 United abandoned its strike and offered to return to work. Six strikers returned to work and in August when a replacement quit another striker returned to work. Respondent gave the replacement strikers a preferential status. At the time of the hearing 7 strikers had been returned to work.

The contested issues are:

1. Whether substantial evidence supports the Board's finding that Respondent failed to bargain in good faith with the certified representative of its electrical maintenance employees, in violation of Section 8(a) (5) and (1) of the Act.

2. Whether the Board properly found that Respondent violated Section 8(a) (3) and (1) of the Act by refusing to reinstate unfair labor practice strikers upon their application.

The difficulty in the way of reaching an agreement between the parties was the insistence on the one hand of the Union to full jurisdiction and seniority rights within its unit and the insistence of the Company on the other of management rights with respect to assignment of work and, later, after the strike began, its right to protect the replacements who had been hired during the strike by giving them the seniority and assurances which had been promised to them before they undertook to replace the strikers. It seems to us in the instant case that the Board appraised the employer's bargaining position with respect to major issues as a means of ascertaining its good faith. It also passed judgment on the reasonableness of the proposals in reaching its finding of bad faith. In effect the Board's appraisal is to apply pressure upon the employer to

make concessions in negotiations. The Board may not either directly or indirectly compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements. In the instant case as in N. L. R. B. v. American National Insurance Company, 343 U.S. 395, 407–408, 72 S.Ct. 824, 96 L.Ed. 1027, the employer offered a counterproposal to a union demand and in the above cited case it was stated that the Board had no right to entertain, or to speculate about, any fears that the use of a management clause may lead to evasion of an employer's duty to bargain as justification for condemning the bargaining for any such clause. These are matters for management and labor to resolve if they can at the bargaining table. If they cannot there be decided then neither the Board nor court can compel an agreement or require a concession.

It is apparent to us that the company all through the negotiations negotiated in good faith. As was said in N. L. R. B. v. Nash-Finch Co., 8 Cir., 211 F.2d 622, 627, 45 A.L.R.2d 683:

> "It seems to us that what the Board has done, under the guise of remedying unfair labor practices, is to attempt to bestow upon the respondent's union employees the benefits which it believes the Union should have obtained but failed to obtain for them as a result of its collective bargaining with the respondent on their behalf."

For the Board to intervene in conflicts between management and labor concerning their respective functions and responsibility would involve it in highly emotional controversies and in the end would result in compulsory arbitration.

■ It is not an unfair labor practice for an employer to bargain in good faith for an agreement assigning particular subjects of collective bargaining to management's exclusive control for the duration of the contract.

■ Having found that the strikers were not unfair labor practice strikers it would necessarily follow that the strikers were economic strikers in which case it would be lawful and proper to grant superseniority to replacements and we so hold.

We have considered all other questions discussed in petitioner's brief and find they have no merit. Our conclusion is that the Board is not entitled to the enforcements of its order.

Its petition for enforcement is denied.