Edward M. HUDSON, Twyman Dew, and Chester L. Williams, on Behalf of Themselves, and Members of Class or Classes Represented by Them, Appellants,

v.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY and Capitol Transit Company, Appellees.

No. 17009.

United States Court of Appeals
Eighth Circuit.

Feb. 28, 1963.

James E. Youngdahl, Little Rock, Ark., and Eugene F. Mooney, Jr., University of Arkansas, Fayetteville, Ark., for appellants. McMath, Leatherman, Woods & Youngdahl, Little Rock, Ark., were with them on the brief.

Bruce T. Bullion, Little Rock, Ark., for appellee Capitol Transit Co.

William M. Clark, Little Rock, Ark., for appellee John Hancock Mut. Life Ins. Co.

Before SANBORN and BLACKMUN, Circuit Judges, and REGISTER, District Judge.

BLACKMUN, Circuit Judge.

This diversity suit, in the nature of interpleader, is a controversy over the disposition of approximately $185,000 in credits on the books of a mutual insur-

ance company which issued a contributory group annuity contract to an employer whose active business has now ceased. Jurisdiction is established. The opposing claimants to the credits are, on the one hand, the employer and, on the other, its former covered employees. The insurer, although it is the instigator of the litigation and a vitally interested participant, is essentially a stakeholder. By its suit the insurer seeks a declaratory judgment and other relief. The case was tried to the court upon admissions in the pleadings and stipulated facts. It resulted in a judgment favorable to the employer. Certain of the employees have appealed.

The insurer-plaintiff is John Hancock Mutual Life Insurance Company. The employer-defendant is Capitol Transit Company. The individual defendants represent stated classes of former employees most of whom were also members of a labor union which was the designated collective bargaining agent for Capitol's operating and maintenance employees. That union, Local 704, Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America, is a "labor organization", within the meaning of § 2(5) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(5). The appellants here are the representatives of that class of former Capitol employees whose employment ceased about June 22, 1955, and who at that time had not completed the continuous service period (20 years) required under the contract in order for them to receive the entire benefit of Capitol's contributions to the plan.

Capitol, from and after its formation in 1952, was engaged in the business of public transportation under municipal franchises in the Cities of Little Rock and North Little Rock, Arkansas. The group annuity contract in question, No. 142, had been issued by Hancock in De-cember 1944 (effective December 31, 1943) to Capital Transportation Company, the predecessor of Capitol Transit Company.[1] Its purpose was to provide retirement annuities and death and termination-of-employment benefits for Capitol's employees. Under the contract Capitol made to Hancock monthly payments which were made up of sums furnished through payroll deductions by the eligible employees of Capitol and of other sums provided by Capitol itself.

Capitol and Local 704 negotiated a series of collective bargaining agreements covering a period from prior to 1944 until June 1955. In several of these negotiations Capitol referred to the annuity plan as a cost factor to it. The plan, however, was not stressed as an item of company cost of doing business any more than any other operating cost. None of the bargaining agreements contained any provision or reference concerning the annuity contract.

The following events then took place:

1. On June 22, 1955, operating and maintenance employees of Capitol, under union sponsorship, walked off their jobs, refused to work, established a picket line in front of Capitol's general offices, and announced that they were on strike. The strikers included a large number but not all of the employees who were covered by the annuity contract.

2. Within 24 hours Capitol gave written notice to each striking employee that his refusal to work was in violation of the labor contract and that unless he reported for work immediately he would be regarded as having quit his employment as of June 22. None of the strikers returned. Capitol thereupon considered each striker's employment terminated as of June 22, 1955, and notified Hancock.

3. Capitol then proceeded to hire operating and maintenance personnel to replace those terminated. These new employees were not covered by the annuity

---

[1]. By amendment effective October 31, 1952, the Transit Company was named as the employer under the contract in place of the Transportation Company. This change has no significance in the present controversy. Unless otherwise specified, we refer to either corporation as "Capitol".

contract until they met its eligibility requirements; among these was the completion of one year of continuous service with Capitol.

4. Some months prior to March 1956 the picket line was withdrawn.

5. Capitol continued to provide public transportation until about March 1, 1956, a date less than a year after the strike began. It then surrendered its franchises and in a short time went into the business of truck and vehicle repair and maintenance for various customers.

6. Citizens Coach Company, a new corporation, was formed in February 1956. It was financed in part through contributions or stock purchases by union members terminated by Capitol in June 1955. Citizens went into the urban transit business in the Little Rock area, succeeding Capitol in so doing, and for its operating and maintenance personnel employed union members who had worked for Capitol and had not found employment elsewhere.

7. Those Capitol employees who were covered under the annuity contract prior to the strike and who, after it began, continued to work for Capitol kept up their monthly contributions due under the contract. Capitol also continued its required payments.

8. On October 31, 1956, Capitol ceased its truck and vehicle repair and maintenance business. Since that date it "has not been actively engaged in business activities". However, from time to time it has disposed of tangible assets and has discharged fixed liabilities. It terminated its remaining employees on that date and has had no employee on its payroll since then. Hancock was notified accordingly. The last payment under the annuity contract for or on account of any employee was that made for the month of October 1956.

The group contract seems to us not to be extraordinary and conforms generally in content with the usual group annuity policy issued on a contributory basis. We summarize its pertinent provisions as best we can in non-technical terms and without reference to numerous exceptions and special situations not of particular pertinence here:

1. Hancock agrees to pay each eligible employee a retirement annuity for life in an amount based on stated rates and schedules and to pay a determinable amount in case of pre-retirement death or pre-retirement termination of employment.

2. The employee, to be eligible for coverage, must be a full-time permanent employee, must have completed at least one year of continuous service, must have attained age 30, and must not have attained age 65.

3. The employee's normal retirement date is the first day of the calendar month following the attainment of his 65th birthday.

4. The employee contributes monthly during the period of his eligibility an amount equal to 3% of his compensation. Capitol, as the employer, similarly makes a monthly payment for each covered employee. The amount of Capitol's payment depends on age, sex, and the employee's own required contribution.

5. Capitol also contributes an agreed amount with respect to each qualified old employee for service rendered prior to the effective date of the contract.

6. The first annuity payment to an employee is made on his normal retirement date. The payments continue monthly during his lifetime and cease with the last one prior to his death. Other optional methods of payment are available under stated conditions.

7. If a covered employee dies prior to his annuity date, Hancock pays his beneficiary a lump sum equal to the total of the employee's contributions (but excluding Capitol's contributions) plus accumulated interest. If death occurs after the annuity date, Hancock pays the beneficiary in a lump sum the amount, if any, equal to the excess of his contributions, as computed just prior to retirement, over the annuity payments already made.

8. If employment is terminated before retirement, the employee within 90 days may exercise an option to take a cash surrender value equal to his (but not Capitol's) contributions already made plus accumulated interest, or a normal retirement annuity based upon his own contributions, or, if he has served 10 years continuously, one based, as well, upon a specified percentage of Capitol's contributions with respect to him. Where the employee serves more than 20 years continuously, all the employer's contributions are devoted to this annuity; if his service exceeds 10 years but is less than 20 years, only a stated percentage thereof is so applied.

9. "Employer's Surrender Values" may arise upon termination of employment prior to retirement. These are "credits to Capitol". They come about when a terminated employee elects to receive the lump sum cash equal to his contributions or when he elects the annuity but has less than 20 years of continuous service. In either case, all or part of the employer's contributions are not available for the employee or for his benefit. The Employer's Surrender Values, however, arise only if the effective date of termination is prior to the liquidation, dissolution, bankruptcy or receivership of Capitol and prior to written notice of discontinuance of the plan.

10. The Employer's Surrender Values "shall be applied toward the payment" of amounts thereafter falling due from Capitol under the contract. Article IV, Section 7, further provides, "There shall not be any surrender value to the Employer on the death of an employee nor shall there be any surrender value to the Employer under any conditions other than as set forth in this Section".

11. The contract "may be modified or altered at any time by an agreement between the Company and the Employer" but this cannot affect the amount or terms of annuities theretofore purchased. Capitol has the power to discontinue the purchase of retirement annuities upon appropriate written notice to Hancock.

In addition to these contractual provisions the following established facts are to be noted:

1. No notice of discontinuance of the purchase of annuities was given by Capitol to Hancock. No liquidation, dissolution, bankruptcy or receivership of Capitol occurred within the meaning of the contract.

2. Employer's Surrender Values resulted from employee terminations on and since June 22, 1955. Of the 213 employees concerned, 175 surrendered their annuity benefits for lump sums in cash; 18 retired and are receiving annuity payments; 6 died and their beneficiaries have been paid; and 14 have not yet reached retirement age but still hold their annuity benefits. Some of these credits have resulted from the elections to take lump sums; the others have resulted from the application, pursuant to the contract, of less than 100% of Capitol's annuity contributions.

3. The benefits which the contract provided for each covered employee in fact have been provided in accord with the express provisions of the contract.

4. Because of the large number of employees who upon termination elected to take lump sum cash or who, if they elected the annuity, had less than 20 years of continuous service, and because of the eventual total absence of employees after a comparatively short time, the resulting Employer's Surrender Values arising under the group contract greatly exceeded the obligations of Capitol thereafter accruing.

5. With the absence of Capitol employees since October 1956 these accumulated credits have lain dormant in Hancock's possession. Because it was possible that Capitol would not be hiring new employees, Hancock sought instructions as to the disposition of the credits. This and the conflicting claims thereto created this lawsuit.

6. The amount of the credit which arose with respect to each terminated employee has been ascertained.

7. Hancock and Capitol have agreed, if it is determined that Capitol is entitled to the credits, as to the net amount due, after a charge for administrative costs, from the insurance company to Capitol.

The district court held that there was no discontinuance of the purchase of annuities within the terms of the contract and no liquidation, dissolution, bankruptcy or receivership of Capitol prior to the effective date of termination of any capitol employee; that all benefits which the contract provided for the employees have been provided for them; that the employees have no claim to the Employer's Surrender Values or in the sums represented by those values; and that Hancock and Capitol have the right to modify the contract as they have done by their conditional agreement.

The employees assert that title and interest in the credits lie solely in those "in whose behalf the annuity contract and arrangement was made and maintained"; that the fund is composed of "those portions of premiums for which the contractual purpose had been frustrated"; and that the credits are allocable to "individual members of the employee group". They argue that the fund must be distributed "in accordance with the intent of all the parties and in the light of material circumstances"; that the contract reveals the intent of Capitol to make "irretrievable contributions"; that employee ownership interest is fixed by their contributions; that distribution to Capitol is not authorized by the contract; that the national labor policy is a material consideration in the construction and interpretation of the contract; and that this policy establishes the employee ownership interest.

We do not over-simplify when we say that the focus of the controversy is the annuity contract's provision that "Such Employer's surrender value shall be applied toward the payment of Employer's Future Service Contributions or Past Service Considerations falling due hereunder * * *", complicated by the great probability that there will be no such contributions subsequently falling due from this employer. With this in mind we consider, one by one, the points which the employees urge:

A. The parties' intent as a controlling factor. The employees' first point—that the fund is to be distributed in accordance with the intent of all the parties and in the light of material circumstances, and that this is particularly so where the contract has no specific provision applicable to the situation and where there is no settled case law—are general propositions which encounter, so far as we can see, no real opposition from Capitol and Hancock. We may accept, too, for purposes of this case, the employees' subordinate suggestions on this point. These are: (1) That the group annuity contract here, although on its face an agreement between Hancock and the employer, has some aspects of tripartiteness (Capitol, Hancock, and the covered employees as a group). See Gallo v. Howard Stores Corp., E.D.Pa., 1956, 145 F.Supp. 909, 911–912, aff'd, 3 Cir., 250 F.2d 37, and Gorr v. Consolidated Foods Corp., 1958, 253 Minn. 375, 381–383, 91 N.W.2d 772, 776–778; but compare Neely v. Sun Life Assur. Co. of Canada, 1942, 203 Ark. 902, 159 S.W.2d 722, 725. (2) That the employees have rendered consideration in the form of monetary contributions, as well as service. (3) That the contract speaks in terms of a defined group of covered employees the composition of which may be constantly changing. (4) That in a controversy over a fund such as this, the express and certain terms of the contract, clearly expressing intent, are to control and be given full effect. N. L. R. B. v. Nash-Finch Co., 8 Cir., 1954, 211 F.2d 622, 626, 45 A.L.R.2d 683; Menke v. Thompson, 8 Cir., 1944, 140 F. 2d 786, 790–791. See Finnell v. Cramet, Inc., 6 Cir., 1961, 289 F.2d 409, 413, and Schneider v. McKesson & Robbins, Inc., 2 Cir., 1958, 254 F.2d 827, 830. (5) That, however, in the absence of express and applicable provisions there are well established rules for ascertaining intent. (6) That among these are (a) that the contract in its entirety should be taken into consideration; (b) that it has been

said that retirement provisions are to be interpreted liberally, Dom v. State Employes' Retirement Board, 1942, 345 Pa. 489, 28 A.2d 796, 798, and Scott v. Greer, 1959, 229 Ark. 1043, 320 S.W.2d 262, 265; and (c) that ambiguous language is to be construed against the scrivener. But, having said all this, we do not find that it advances us very far toward the resolution of this case.

B. Capitol's intent as to the retrievable or irretrievable character of its contributions. The employees urge that the contract reveals that Capitol intended that its payments to Hancock be irretrievable and that this is so because (1) of the compensatory nature of Capitol's contributions; (2) of the income tax benefit the plan afforded to Capitol; and (3) of the contract's treatment of other credits. They would buttress the compensation argument by recalling Capitol's representations in past labor negotiations that its payments under the plan were an element of its operating costs; by asserting that a retirement plan promotes employee loyalty and lessens turnover; by claiming that an employer's contributions in this day can no longer be considered as gratuities; and by concluding that, as with wages paid directly, an employer cannot expect its retirement plan payments to be retrievable. They rest the tax argument on the apparent qualification (the record does not specifically disclose this) of the plan under § 401(a) of the Internal Revenue Code of 1954 with the consequent deductibility under § 404(a) (2) (and presumably, also, on the corresponding §§ 165(a) and 23(p) of the 1939 Code) of Capitol's contributions; on the claimed obvious design of the plan so as to qualify for that deduction; and on the emphasis in § 401(a) (2) and in the Regulations, § 1.404(a)–8 (a) (1) and (3), that the plan be for the exclusive benefit of employees. As to the

other credits under the contract, they point to provisions beneficial to the employees in the event of discontinuance of annuity purchases.

One must readily grant that Capitol's contributions entered into its cost of doing business. Certainly an employer, such as Capitol here, observing the flow of contribution dollars from it to Hancock, would regard a contrary view as one which is less than realistic. But if we grant, as well, that an employer's retirement plan contributions are not gratuities and that the plan has the practical characteristics of promoting employee loyalty and the like, we still do not perceive how this necessarily converts every part of the employer's retirement plan payments irreconcilably into employee property or even discloses an intent in the contracting parties to achieve that end. Compare United States v. Embassy Restaurant, Inc., 1959, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601. This contract's provision for the emergence of employer's surrender values, their very name, and their customary application for Capitol's benefit in reduction of future amounts due from it for annuities, involving even new employees, all negate a complete and vested property interest for the terminated employees or an intent of the parties to create one.

If there were any weight at all to the tax argument it is entirely dissipated by the provisions of Rev.Rul. 57–163, Part 3, 1957–1 C.B. 128, 137–39.[2] This relates to qualified plans and recognizes the principle of prohibited diversions. Nevertheless it allows repayment to an employer of items similar in character and under circumstances corresponding to those prevailing here without destruction of the qualified character of the retirement plan and the deductibility of the employer's payments thereunder.[3]

---

**2.** This ruling has since been modified and amplified. Rev.Rul. 58–151, 1958–1 C.B. 192; Rev.Rul. 59–185, 1959–1 C.B. 86; Rev.Rul. 60–84, 1960–1 C.B. 159; Rev. Rul. 60–323, 1960–2 C.B. 148. These

later rulings, however, do not affect Part 3 of Rev.Rul. 57–163.

**3.** What the income tax consequence would be of the payment to Capitol of the sum equal to the employer's surrender value

The contract's provisions as to the treatment of other credits also fails to persuade us. The factual situation where these provisions come into play has not developed. The provisions, furthermore, are directed, in their operating effect, to the situation where suspension or discontinuance of annuity purchases occurs before the termination of employment. Here the opposite occurred. Obviously there are different approaches, based on underlying policy and retirement plan theory, in the situation where, on the one hand, the employer utilizes power which it has under the contract unilaterally to discontinue and in the situation where, on the other hand, the employees have received or are assured of all the benefits provided for them under the contract. Compare Gorr v. Consolidated Foods Corp., supra, pp. 383–386 of 253 Minn., pp. 777–779 of 91 N.W.2d.

C. Employees' contributions as bearing upon their ownership in the Employer's Surrender Values. The employees' argument here is two-fold. It is first said that equitable ownership rights of the employee group are implicit throughout the contract; that this is a ten-year vesting plan; that an employee with that much continuous service may elect lump sum cash or an annuity; that, however, if he selects the annuity its size is determined by only a percentage of his own contributions plus a percentage of the employer's contributions; that the remaining portion of his contributions then necessarily makes up part of the Employer's Surrender Values; and that his contributions therefore create and comprise an ownership interest in them. It is said, secondly, that employee group ownership is established by those provisions of the contract which cover the situation where termination occurs after discontinuance; that no surrender values there arise; that the entire fund is then owned by the employees irrespective of length of service; that we have before us a situation of "substantial discontinuance"; that although liquidation, dissolution, bankruptcy or receivership is not discontinuance, no surrender values arise then and the employees have a vested interest in the entire fund; that there is de facto discontinuance here; that the filing of the action by Hancock was equivalent to formal discontinuance; and that the employees did not receive what they bargained for, namely, the opportunity to work for 20 years and to retire with full pension rights.

We readily conclude that this argument is based upon a misapprehension and a mistaken analysis of the contract. The agreement, as is so often the case with insurance language, is not easily read and digested and it contains some language and structure which promote confusion. Nevertheless, we think it is clear that the employee who has terminated after 10 years' continuous service and who selects an annuity gets the benefit of every cent he has contributed during employee status and that no part of his contributions enters into the creation of the Employer's Surrender Values. It is, first of all, stipulated that the "benefits which the contract provided for each employee have in fact been provided for in the form of annuities or paid in cash * * * in accordance with the express provisions of the contract, based on his or her own contributions, the correct portion of Capitol's contributions * * * and other factors * * *." Furthermore, the confusion is occasioned by Schedule I in Article IV of the contract. This designates percentages of the yearly amounts of the Employee-Contributions-Annuity and of the normal future service and past service annuities already purchased for the employee. But one must not confine his review of the contract to this schedule. The agreement also provides that the annuity the 10-year terminated employee receives is made of that part purchased with his own contributions in the aggregate and an additional amount attributable to a

---

credits, net, is a matter not before us. That is Capitol's problem and is of no

concern to Hancock or to the appellant employees.

specified percentage of the employer's contributions. Schedule I refers to percentages but it does not exclude from the employee's enjoyment the benefit attributable to the remainder of his contributions. The employee thus gets the full benefit of his own payments. The contrary would make no sense, for by that view of Schedule I the employee would benefit less from his own contributions the longer he worked.

The argument based upon discontinuance is no more convincing. It is answered by observing that termination of the appellant-employees clearly took place here before, not after, any conceivable discontinuance. Capitol was still actively engaged in the transit business on June 22, 1955, when these appellants terminated and the plan continued operative certainly through October 1956. The contract's provisions having to do with discontinuance prior to termination thus have no application to the facts of this case. To apply them here would be to rewrite the contract. We note that similar arguments were made without success in Gorr v. Consolidated Foods Corp., supra, pp. 384–390 of 253 Minn., pp. 778–781 of 91 N.W.2d. And an argument based upon the employees' anticipations and expectations provides "no justification for a court 'to twist the Plan into something it clearly is not' ". Schneider v. McKesson & Robbins, Inc., supra, p. 830 of 254 F.2d; Bailey v. Rockwell Spring & Axle Co., Sup.Ct., 1958, 13 Misc.2d 29, 175 N.Y.S.2d 104, 108.

D. The contract's non-authorization of the proposed distribution to Capitol. The employees here assert that, although Capitol and Hancock have certain express powers to modify the contract, the law prohibits any modification in derogation of vested rights of the beneficiaries and that this is particularly so where the insureds have the "party status of the employee group here".

This argument is another one which presupposes the existence of employees' vested rights. What we have said above applies with equal pertinence here. The stipulation that the contract's benefits for each employee have been provided and the conclusion that no part of the Employer's Surrender Values are attributable to the employees' contributions destroy the appellants' argument. We do not understand the appellants' additional suggestion that the trial court reached its conclusion as to the propriety of the Capitol-Hancock agreement by undue reliance on the participation features of the annuity contract; we see nothing in the findings indicative of this. It follows that the Capitol-Hancock agreement as to the disposition of the credits is permissible.

E. The national labor policy. The argument here is that the retirement plan is representative of a great national development; that the parties come within the jurisdiction of the Labor Management Relations Act, 1947, 29 U.S.C. §§ 141–187; that although this plan was not incorporated in the Capitol-Local 704 collective bargaining agreements, it was "in material aspects a part of the broad * * * agreement"; that the annuity contract is a contract within the meaning of § 301 of the Act, 29 U.S.C. § 185; that the policy of that legislation must control; that the policy expressions of the Welfare and Pension Plans Disclosure Act, 29 U.S.C. § 301, are also pertinent and applicable; and that the national labor policy is therefore material in resolving this litigation. From this the argument proceeds to the effect that Capitol has the duty to bargain with the Local on the distribution now contested; that this duty has been violated; and that the seniority concept entitles each employee to some appropriate share of the Employer's Surrender Values.

This argument, too, does not warm us and indeed strikes us as a bootstrapping approach. Although the appellant employees were members of the Local, the union is not a party to this litigation. It is not a party to the annuity contract. Its membership did not include all employees of Capitol. The annuity contract made no reference to any collective bargaining agreement and none of the bargaining agreements between the Local and Capitol or its predecessor made any

reference to the annuity contract. The eligibility of any employee to participate in the plan did not depend on union membership. Any duty to bargain on request can have no conceivable application as to the meaning of this plan which already was long in effect. And it has not been demonstrated how the retirement plan is in any way out of harmony with national labor policy or how that plan prohibits the results reached by the trial court. The appellants have approached this case as though it has to do with unfair labor practices. We suspect that therein lies their primary confusion. This is a contract controversy and not a labor one.

At the oral argument the appellants brought to our attention the case of Fernekes v. CMP Industries, Inc., 1961, 15 A.D.2d 128, 222 N.Y.S.2d 582, motion for leave to appeal dismissed for lack of finality, 11 N.Y.2d 792, 227 N.Y.S.2d 33, 181 N.E.2d 773. The salaried employees retirement and profit sharing plan there involved was a trusteed and not an insurance plan. Unfortunately, the report does not disclose the provisions of the trust agreement other than to say that the plan could be terminated by the company at any time and that "In that event provision is made that the trustee shall hold their assets for the sole and exclusive benefit of the members". The court held that the disposal of one of the company's two divisions "resulted in a significant constriction of its corporate activities" and "the program can be said to have been discontinued in the Transportation Division". It distinguished Schneider and Bailey, both supra, on the ground that those two cases presented situations of far less significant percentages of discharged employees. Although this factual distinction exists between these New York cases, we cannot so easily cast aside both Schneider and Bailey. Each gave emphasis to the provisions of the contract there involved and refused to allow it to be rewritten through allegedly equitable or other argument. In the case before us "discontinuance" has a definite contractual meaning. In view of the absence of information in the report as to the plan with which the Fernekes case was concerned, we cannot regard it as authority adverse to the conclusions we reach here.

In summary, we feel that the employees' arguments overlook the fact that we are concerned with the interpretation and construction of a contract; that we are not concerned with a labor dispute; that the case must be decided by the application of principles of the law of contracts; that these principles compel an affirmance of the judgment of the district court; and that this result is not to be defeated by arguments drawn from tax considerations, national labor policy, and other minor and obviously only collateral aspects which singly or in the aggregate cannot change the basic character of the problem. We stress again that the benefits which the contract provided for each employee have in fact been furnished; that the Employer's Surrender Values are traceable in their entirety to Capitol's payments to Hancock; that these credits do not affect the amount and terms of the annuities already purchased and the sums already paid to the employees; that each such credit emerges, as the contract provides, only because the particular employee either elected the lump sum cash benefit or had not rendered the continuous service required for full consumption of Capitol's contributions; and that, in normal operation of the plan, the credits serve to reduce sums otherwise due from Capitol and only from Capitol. All this does not add up to vested rights for employees. It smacks, instead, of intended ownership in Capitol. The credits are rightfully subject to the agreement between Hancock and Capitol and are properly returnable to the source from which they came.

Affirmed.