F. J. GUNTHER, Petitioner,

v.

SAN DIEGO & ARIZONA EASTERN
RAILWAY COMPANY, a corpo-
ration, Defendant.

No. 2459–SD.

United States District Court
S. D. California, S. D.

Sept. 27, 1961.

Charles W. Decker, San Francisco, Cal., Clifton Hildebrand, Hildebrand, Bills & McLeod, Oakland, Cal., Gostin & Katz, San Diego, Cal., for petitioner.

Gray, Cary, Ames & Frye, James W. Archer, Eugene L. Freeland, San Diego, Cal., W. A. Gregory, William R. Denton, San Francisco, Cal., for defendant.

WEINBERGER, District Judge.

Petitioner is before the Court in this action with the second of two petitions seeking to enforce an award and order of the National Railroad Adjustment Board, hereinafter called the "Board". The first petition was filed in case No. 2080–SD–W, transferred to this Division from the Northern District. A motion for summary judgment was made by the defendant railroad, and we ruled that the record before us did not reveal an award and order with which the railroad had refused to comply. Gunther v. San Diego, D.C., 161 F.Supp. 295. On July 15, 1958 further proceedings were stayed because petitioner stated he had filed a petition before the Board for an interpretation of its award and order, or for the issuance of a supplemental award determinative of his right to reinstatement in active service with the defendant railroad. The Board did render an award and order on October 8, 1958, but this second award was not presented to this Court in the case then before it, case No. 2080. In March, 1959, petitioner moved to dismiss the said case without prejudice; the Court denied the motion to dismiss and granted defendant's motion for summary judgment on the basis of the ruling mentioned above. In the findings and conclusions on motion for summary judgment, the Court found it was not necessary at the time to decide whether the Board had jurisdiction to order the appointment of a board of physicians to examine petitioner, and that it was not necessary at the time to consider the terms of the agreement between the defendant and petitioner's Union. The findings and conclusions in case No. 2080 are set forth in the Court's opinion reported at D.C., 192 F.Supp. 882.

Nearly two years after the rendition of the award of October 8, 1958, petitioner brought the same to the attention of this Court by a petition to enforce said award filed September 26, 1960. A motion for summary judgment filed by the railroad was denied without prejudice to the making of a similar motion on lim-

ited grounds. (Gunther v. San Diego, D.C., 192 F.Supp. 882.) The railroad filed an answer, then a second motion for summary judgment which was noticed for hearing on May 29, 1961; after statements, affidavits and briefs were filed and oral and written argument had, the motion was submitted on July 21, 1961.

The defendant is a Nevada Corporation, a railroad carrier subject to the Interstate Commerce Act, with its principal operating office located in the Southern District of California. Petitioner was employed by defendant on December 18, 1916, as a fireman and thereafter was continuously in the active service of defendant until December 30, 1954. On said latter date, which was shortly after petitioner's 71st birthday, petitioner was disqualified from service after a physical examination. At his request, he was sent to the Southern Pacific General Hospital and there examined by carrier's medical superintendent, following which the chief surgeon determined that petitioner should not be returned to service. Petitioner's own physician disagreed with the company doctors as to petitioner's disqualification, and petitioner presented a claim to defendant for reinstatement to active service with back pay, and when defendant denied the claim, submitted the same to the National Railroad Adjustment Board, First Division. The findings and award of the Board, dated October 2, 1956 are included in the Appendix to this memorandum, as "Exhibit A". Following issuance of the award, a board of three physicians as therein provided was selected, and the Board, on October 8, 1959 made findings and award, which are included in the Appendix as "Exhibit B". Thereafter, defendant again refused to reinstate petitioner to active service. (Petitioner alleges the majority of the physicians found that he had no defect which in their opinion would prevent him from performing his duties as a locomotive engineer; defendant alleges the decision of the majority supported that of the Company doctors.)

The Board, in its award of October 8, 1959 ruled that the majority of the three physicians had decided petitioner had no physical defects which would prevent him from carrying on his usual occupation as engineer, and ordered that petitioner be reinstated with pay for all time lost.

It is our view that the two awards and the two orders must be construed together as one award and one order, taking effect with the issuance of the second.

A collective bargaining contract was entered into between the Brotherhood of Locomotive Firemen and Enginemen, petitioner's Union, and the defendant on March 1, 1935. The Agreement is on file, and portions of the same referred to by petitioner in his affidavit and in the brief of his counsel and relied upon in support of his position herein, are found in the Appendix to this memorandum under headings: "Article 35, Seniority", "Article 38, Reduction of Force" and "Article 47, Investigations".

The defendant's motion for summary judgment asks this Court to rule:

"There is no genuine issue as to any material facts, and the undeniable facts show that there is no agreement provision to support the award and order in favor of petitioner and against defendant". and,

"The First Division, National Railroad Adjustment Board, issued its Award No. 17646, Docket 33531, and its order under said docket number, under date of October 8, 1958, in excess of its jurisdiction under the Railway Labor Act. Therefore, said Award and Order are unenforceable". (Defendant's proposed findings and conclusions filed May 16, 1961, p. 3.)

Petitioner's position is that the motion for summary judgment should not be granted because, in order to interpret the contract, it will be necessary to consider evidence of custom and usage * * this for the purpose of arriving at the intent of the parties; he maintains that those portions relating to his right of continued employment, to-wit, seniority

and limited right of discharge, are ambiguous and require extrinsic evidence as an aid to their interpretation, and argues, at page 2 of his brief that "the unqualified right of defendant to determine the physical fitness of its employees is nowhere to be found in said Agreement, whereas petitioner's right to continued employment is set forth in Articles 35 and 47 thereof" and at page 3, "The Agreement sued upon herein by providing for seniority rights and discharge only for good cause, limits the power of the employer to suspend or discharge employees from active employment."

The affidavit of petitioner in opposition to the motion for summary judgment offers testimony with reference to custom and practice. Mr. Gunther avers that for many years he was General Chairman of the Brotherhood of Locomotive Firemen and Enginemen and as such actively engaged in enforcing the provisions of the Agreement referred to in his petition. The affidavit then sets forth portions of Article 35 (Seniority), Article 47 (Investigations), and Article 38 (Reduction of Force) of the agreement and states that such provisions are vague, ambiguous and are not sufficient to specify the precise rights of the employees covered thereby with respect to duration of employment and the rights if any, of the employer to restrict same.

Petitioner continues: "That at all times pertinent herein the interpretation of said provisions, and their application to defendant's operations were done by reference to a long history of custom and practice in the railroad industry; that, for example, because the '* * * (R)ights of engineers * * * governed by seniority in the service of the Company * * * were not specified in detail in said Agreement, their substance could only be, and was, determined by resort to custom and practice in the industry'." The affidavit details the custom with reference to seniority, stating that the most senior engineer was entitled to the assignment of his preference and, in the event of elimination of such assignment by reduction of work force or

otherwise, such senior engineer had the right to displace a junior, etc., and further argues "that defendant's removal of petitioner from the assignment of his choice on December 30, 1954 was in violation of petitioner's seniority rights as conferred by said Agreement, because, at said time, petitioner was senior to the engineer who replaced him on said assignment and, for that matter, to all other engineers in the employ of defendant."

Petitioner's affidavit further avers "that at all times it was never the custom and practice for the active employment of an engineer covered by said Agreement to be terminated by retirement against the will of such engineer."

The brief of petitioner also urges that custom and usage may be looked to to explain the meaning of language and to imply terms where no contrary intent appears from the terms of the contract.

The defendant has filed an affidavit which alleges that locomotive engineers employed by the railroad are and have always been required by Company policy to take and pass periodic physical examinations and re-examinations to determine their fitness to remain in service; that in the year 1954 these requirements provided and still provide that employees of age seventy and over must take and pass such a physical examination every three months; that in accordance with such rule Mr. Gunther reported for physical examination on November 24, 1953 and for additional examinations or re-examinations in each successive three month period to and including December 15, 1954; that after the examination on the latter date, the defendant's physicians determined that Mr. Gunther was not qualified to remain in service as a locomotive engineer; that these findings were reviewed at the defendant's hospital, and the Chief Surgeon of the railroad concurred in the findings and in the opinion that Mr. Gunther's heart was in such condition that he would be likely to suffer an acute coronary episode; that based upon this conclusion, the

railroad declared Mr. Gunther physically disqualified.

The defendant's affidavit further states that prior to December 1, 1959 locomotive engineers disqualified upon advice of the company physicians for physical reasons were either permitted to work on a restricted basis or removed entirely from active service in accordance with the recommendations of the doctors * * * and the doctors recommended that Mr. Gunther not be returned to active duty, and the defendant followed the recommendation. Defendant further states that until December 1, 1959 the Collective Bargaining Agreement between petitioner's Union and the defendant contained no provision for a three doctor panel to review the carrier's findings of physical disqualification. That on August 28, 1959, the Union asked that the Agreement be amended to include such a provision, the defendant acquiesced, and the amending agreement was made between the Union and the defendant on December 1, 1959.[1]

The major purpose of the Railway Labor Act (45 U.S.C.A. § 151 et seq.) is to avoid strikes by employees of carriers in interstate commerce, and the consequent interruption of interstate commerce, by promoting orderly and peaceful settlement of disputes affecting carriers and their employees. Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795. To that end, it is in aid of collective bargaining, and its design, purpose and result is to make such bargaining effective. Estes v. Union Terminal Co., 5 Cir., 89 F. 2d 768. It is the duty of the employer and employee under the Act to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, and to consider and determine all disputes, if possible, in conference between employer and employee and authorized representatives of each. The policy of the Act is to encourage the use of non-judicial processes; Brotherhood of Railroad Trainmen Enterprise Lodge No. 27, v. Toledo, etc., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534. Thus, in the case of a "minor" dispute, one arising out of the interpretation or application of existing collective bargaining agreements and grievances arising therefrom, the parties are to confer, and if the dispute cannot be settled by conference, either party may resort to the appropriate division of the National Railroad Adjustment Board. With a "major" dispute, such as may arise from an intended change in agreements affecting rates of pay, rules or working conditions, resort to mediation and arbitration is provided for, 45 U.S.C.A. §§ 154, 155, 159. Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 722–724, 65 S.Ct. 1282, 89 L.Ed. 1886; Brotherhood of R. R. Trainmen v. Chicago, etc., 353 U.S. 30, 34, 77 S.Ct. 635, 1 L.Ed.2d 622; finally, the statute includes conciliation by presidential intervention.

We are here concerned with a dispute of the first mentioned class[2]. Subd. 1, Subsection (i) of Section 153 (45 U.S.C.A.) states:

"The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * * shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by

1. We speak of the contract as it read at the time of petitioner's disqualification from service, unless otherwise indicated.

2. Brotherhood, etc. v. New York Central R. Co., 6 Cir., 246 F.2d 114, certiorari denied 355 U.S. 877, 78 S.Ct. 140, 2 L. Ed.2d 107.

petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

"(j) Parties may be heard either in person, by counsel, or by other representatives, as they may respectively elect, * * * ."

The Section further provides that the awards shall be final and binding upon both parties to the dispute,[3] except insofar as they shall contain a money award, and that if a dispute arises concerning the interpretation of the award, the Board shall interpret the same upon request of either party. When an award is made in favor of the petitioner, the Board shall direct the carrier to make the award effective.

Subd. 1, subsection (p) provides that if the carrier does not comply with the order, the petitioner may file in the District Court of the United States a petition, setting forth briefly the causes for which he claims relief, and the order of the Board, whereupon the suit shall proceed in all respects as other civil suits, except that on the trial of such suit the findings and order of the Adjustment Board shall be prima facie evidence of the facts therein stated.[4] The District Courts are empowered under the rules of the court governing actions at law, to make such order and enter such judgment, by writ of mandamus or otherwise, as may be appropriate to enforce or set aside the order of the division of the Adjustment Board.

The National Railroad Adjustment Board, created by statute June 21, 1934 (Section 153 of Title 45 U.S.C.A., a portion of the "Railway Labor Act", 45 U.S.C.A. § 151 et seq.) has 36 members, 18 of whom are selected by carriers and 18 by national labor organizations. The Board acts through four divisions, the first of which has jurisdiction over disputes involving train and yard-service employees of carriers, such as engineers, firemen, etc., and which has 10 members, 5 selected by carriers and five by national labor organizations. Any division has authority to establish Regional Adjust-

---

3. The words "final and binding" have their limitations. Dahlberg v. Pittsburgh & L. E. R. Co. et al., 3 Cir., 138 F.2d 121, 122. When the award is unfavorable to the employee, the Board's decision is final. Washington Terminal Co. v. Boswell, 75 U.S.App.D.C. 1, 124 F.2d 235, 245, affirmed 319 U.S. 732, 63 S.Ct. 1430, 87 L.Ed. 1694. When it is unfavorable to the carrier, the decision may not be enforced except as the court orders, after an enforcement suit is brought by the employee. The Court hears the case de novo and may enforce or set aside the Board's decision.

4. The duties of the Court with reference to the findings and awards of Railroad Adjustment Boards have been well defined in the reported cases. Washington Terminal Co. v. Boswell, supra, note 3, states at page 241 of 124 F.2d: "It cannot be assumed, therefore, that the findings have no substantive effect, merely because they were not given finality, as to either facts or law. They are probative, not merely presumptive in value, having effect fairly comparable to that of expert testimony." Dahlberg v. Pittsburgh & L. E. R. Co. et al., supra, (note

3.) at page 122 of 138 F.2d: "The Act provides that the suit for enforcement shall 'proceed in all respects as other civil suits' except that the findings and award 'shall be prima facie evidence of the facts therein stated.' * * * These procedural directions are particularly appropriate to a trial on the merits of disputed issues of both fact and law; less so to a mere examination of the scope of the Board's authority." Some of the reasons assigned for the weight to be given the Board's findings are: The employee has the advantage of having a prima facie case prepared for him when he files an enforcement suit in the District Court and is thus spared such expense, Washington Terminal v. Boswell, supra; The Board has "expertise" adapted to interpreting such agreements, Elgin J. & E. R. Co. v. Burley, 327 U.S. 661, 664, 665, 66 S.Ct. 721, 90 L.Ed. 928; and as observed in Slocum v. Delaware, etc., 339 U.S. 239, 243, 70 S.Ct. 577, 579, 94 L.Ed. 795, "Precedents established by it, while not necessarily binding, provide opportunities for a desirable degree of uniformity in the interpretation of agreements throughout the nation's railway systems".

ment Boards to act in its place and stead (with the same force and effect) for such limited periods as deemed necessary, membership to be divided equally between those designated by the carrier and labor members. The Section provides that upon the inability of a Division (or a Regional Board) to agree because of a deadlock or a failure to secure a majority vote, it may appoint a neutral person as Referee to sit as a member to make the award.

Each of the decisions of the First Division of the National Railroad Adjustment Board with which we are here concerned was made with the aid of a Referee.

This Court has jurisdiction in the premises; the Railroad Adjustment Board has made an award in favor of an employee of a carrier engaged in interstate commerce, and the carrier has refused to comply with the order.

■ The jurisdiction of the Railroad Adjustment Board is limited to disputes over the interpretation and application of collective bargaining contracts between the carriers and their employees. Southern Pacific Co. v. Joint Council Dining Car Employees, 9 Cir., 165 F.2d 26.[5] Where, as in this case, the employee maintains he was removed from service in violation of the contract, and where the carrier claims the removal did not violate the contract, a dispute concerning the interpretation or application of a collective bargaining agreement of which the Board has jurisdiction under the Act is presented.

The Agreement must be deemed to incorporate the provisions of the statute, thus we must examine both the Railway Labor Act and the Agreement in making our decision to enforce or set aside the decision of the Board. The petitioner is entitled to reinstatement only if wrongfully removed from service, and he was wrongfully removed only if some right arising out of the contract or the law was violated.

■ The employer-employee relationship existed long before the origin of collective bargaining agreements made effective by labor laws, and one of the common law rights inherent in such a relationship is the right of the employer to hire and fire his employees. This right exists today, except to the extent that it may be modified by statute or contract. United States Steel Corp. v. Nichols, 6 Cir., 229 F.2d 396, 56 A.L.R.2d 980. Such right is not abridged by the Railway Labor Act or the Labor Relations Act so long as the collective bargaining process is not impaired. N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893; Texas & N. O. R. v. Brotherhood of Ry. and S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034; N. L. R. B. v. Superior Co., 6 Cir., 199 F.2d 39, 42; N. L. R. B. v. Tennessee Coach, 6 Cir., 191 F.2d 546, 550; Beeler v. Chicago, R. I. & P. Ry. Co., 10 Cir., 169 F.2d 557, 560.

No claim is made that petitioner's union activities or lack of them had anything to do with his removal from service.

In interpreting this particular Agreement, and in order to call to our aid the reported cases, it is necessary to consider the nature of the collective bargaining process, as well as the numerous types of agreements to which the published opinions relate. The collective bargaining provisions of the Railway Labor Act are similar to those of the Labor Relations Act, and cases interpreting the provisions of agreements executed under one Act may be of aid in interpreting agreements under the other, provided we do not overlook differences in the types of agreements or in the laws relating to their enforcement.[6]

---

5. Certiorari denied 333 U.S. 838, 68 S.Ct. 608, 92 L.Ed. 1122; Thomas v. New York C. & St. L. R. Co., 6 Cir., 185 F.2d 614, 616.

6. In this connection, we keep in mind Mr. Justice Rutledge's warning in Washington Terminal Co. v. Boswell, 75 U.S.App. D.C. 1, 124 F.2d 235, 243, affirmed 319 U.S. 732, 63 S.Ct. 1430, 87 L.Ed. 1694, against ignoring "the always present limitation upon judicial language imposed by the facts concerning which it is used."

The Agreement before us is what we might call a "barebone" agreement, in that it relates mainly to wages, hours, seniority, and discharge. No mention is made regarding disability of an engineer, other than in Article 29, where it is stated that if an engineer is physically disabled on account of the loss of the sight of one eye, and is required to give up his run, he will have the privilege of displacing any engineer junior in branch service. (No provision is made for an engineer losing *both* eyes.)

The simplicity of the Agreement is understandable in view of the fact as stated by eminent writers on the subject (Professors Archibald Cox and John T. Dunlop, "Regulation of Collective Bargaining by the National Labor Relations Board", Harvard Law Review, 1950, Vol. 63, pp. 389, 391), that in early years of collective bargaining the unions were busy organizing additional workers and securing agreements on familiar subjects, and many unions, strong enough to present broader demands, were content to bargain on such traditional subjects as wages, hours of work, seniority and union status.

Some of the modern-day agreements contain clauses setting forth certain areas as "strictly within management prerogatives", others contain clauses to the effect that "past practices shall not be changed except by mutual consent", still others provide that neither side "will assert any right during the term of the contract to bargain on any subject covered or referred to in the contract", still others contain "no-strike" clauses and provide that disputes over the interpretation of the contract shall be referred to arbitrators. As was said by the Supreme Court in United Steelworkers of America v. Warrior & Gulf Co., 363 U.S. 574, 580, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409, "The mature labor agreement may attempt to regulate all aspects of the contemplated relationship, from the most crucial to the most minute over an extended period of time".

None of the provisions mentioned in the preceding paragraph is found in the Agreement involved herein.

Professors Cox and Dunlop, in the article above cited, have noted that as union power increased, some sought to expand the scope of joint-management decisions into areas for which management traditionally had exclusive responsibility—not only pensions and merit increases, but also the scheduling of shifts, subcontracting and technological change—expanded the scope of their demands until they came in contact with management's reluctance to surrender its "prerogatives" and sharp controversies resulted over the proper functions of management and union.

It is just such a "sharp controversy" that we have before us, except the controversy is not between the Union and the carrier, but relates only to an individual employee. Management claims that the employee must point to a provision in the Agreement prohibiting the action it took, the worker points to the provisions regarding seniority and discharge but in the same breath says they are ambiguous and must be explained by extrinsic evidence, and in another breath intimates that even if with these aids his position is not clarified, the Railroad Adjustment Board had power to "imply" terms into the contract to support its decision.[7]

7. Some of the language in the 1960 Supreme Court opinions, United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf, etc., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 and United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 might seem to lend support to petitioner's theory. For instance, in the Warrior case opinion, 363 U.S. at pages 578 and 579, 80 S.Ct. at page 1351 it is said:

"The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. See Shulman, Reason,

What rights did the Railroad possess when it went into the bargaining room with the Brotherhood 26 years ago?

Contract, and Law in Labor Relations, 68 Harv.L.Rev. 999, 1004–1005. The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant. * * * " The opinion (363 U.S. at page 579, 80 S.Ct. at page 1351) quotes Professor Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1498–1499:

"* * * [I]t is not unqualifiedly true that a collective-bargaining agreement is simply a document by which the union and [the] employees have imposed upon management limited, express restrictions of its otherwise absolute right to manage the enterprise, so that an employee's claim must fail unless he can point to a specific contract provision upon which the claim is founded. * * * "

Likewise, there is language in the first two sentences of a paragraph in the Enterprise opinion which seems to aid petitioner, but serves to leave him without comfort in the third, 363 U.S. at pages 598, 599, 80 S.Ct. at pages 1361, 1362:

"The collective bargaining agreement could have provided that if any of the employees were wrongfully discharged, the remedy would be reinstatement and back pay up to the date they were returned to work. Respondent's major argument seems to be that by applying correct principles of law to the interpretation of the collective bargaining agreement it can be determined that the agreement did not so provide, and that therefore the arbitrator's decision was not based upon the contract. *The acceptance of this view would require courts, even under the standard arbitration clause, to review the merits of every construction of the contract.* * * * "

We emphasize the last sentence because, under the Railway Labor Act the District Court *is* required, in a suit for enforcement of an award, to review the merits of every construction of the contract.

In the Enterprise case, the Court further discussed the finality of the arbitrator's award, and stressed the premise that "the question of interpretation of the collective bargaining agreement is a question for the arbitrator." It stated: (363 U.S. at page 599, 80 S.Ct. at page 1362)

What rights did it lay on the bargaining table? Were all of those rights mentioned in the contract? Or did the Union

"* * * It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns [the] construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his."

In the American case the Court similarly stressed the importance of the arbitrator, 363 U.S. at page 568, 80 S.Ct. at page 1346:

"* * * Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment *and all that it connotes* that was bargained for." (Emphasis supplied.) In the Warrior case at page 581 of 363 U.S., 80 S.Ct. at page 1352, the Court stated:

"The labor arbitrator performs functions which are not normal to the courts; the considerations which help him fashion judgments may indeed be foreign to the competence of [the] courts. * * * "

The Court also, 363 U.S. at page 581, 80 S.Ct. at page 1352, quoted from the late Dean Schulman, as follows:

" 'A proper conception of the arbitrator's function is basic. He is not a public tribunal imposed upon the parties by superior authority which the parties are obliged to accept. He has no general charter to administer justice for a community which transcends the parties. He is rather part of a system of self-government created by and confined to the parties. * * * ' "

There are other pronouncements in these opinions which serve to underline the Supreme Court's views of the arbitrator's functions and the finality to be accorded his decisions. We need not set them all out, for their phraseology likewise makes it clear that the references are to provisions in modern-day contracts unlike the Agreement here, and to rules of enforcement not intended to be applicable under the Act which governs this Court in this proceeding.

In Brotherhood of Ry. and S. S. Clerks, Freight Handlers, Exp. and Station Emp., etc., v. Atlantic Coast Line R. Co., 2 Cir., 253 F.2d 753, at page 757, Chief Judge Parker of the Fourth Circuit, said:

"If it had been intended, as appellant argues, that the orders of the Board rendered pursuant to 45 U.S.C.A. § 153 should have the effect of awards of ar-

put some in its pocket to use when needed? Or did management retain those not in the contract?

We know that management took with it the common law right to hire and fire at will, except for certain statutory restrictions not pertinent here. It is our task to ascertain what happened to such right and what portion of it resided with the defendant when it removed petitioner from service.

It is obvious from a reading of the Agreement that neither the seniority clause (lay-off provisions refer also to seniority) nor the clause pertaining to discharge (headed "Investigation") contains any words referring to retirement for physical disqualification or for any other reason. In fact the entire agreement has no words referring to such matters, other than the clause we have mentioned having to do with an engineer who has lost one eye.

Perhaps because the meaning of "seniority" is so well understood and judicially determined, there have been few cases where the issue of retirement for any reason as contravening the seniority clause by itself, has been considered by the courts. In most of the reported cases, if seniority is referred to by the employee in presenting his case against retirement, it is coupled with a contention that the retirement violated both the seniority and discharge clauses of the collective bargaining agreement.[8]

Hon. Paul J. McCormick, the late Chief Judge of this District, sitting with the Court of Appeals of our 9th Circuit, observed, most aptly in Colbert et al. v.

bitrators, some such provisions as are contained in 45 U.S.C.A. §§ 158 and 159 which relate to arbitration under 45 U.S.C.A. § 157, would have been provided for their enforcement. The fact that an entirely different provision was made for the enforcement of Board orders under section 153 from that made for enforcement of arbitration awards entered under the existing statute relating to arbitration is a matter which cannot be ignored and which shows clearly that Congress did not intend Board orders to have the effect of arbitration awards".

8. There are several interesting decisions in the Labor Arbitration Reports. Most of the arbitrators, when considering seniority have likewise considered the discharge clause of the labor contract in connection with retirement for age.

In Todd Shipyards Corp., 27 LA 153 the arbitrator held that the employer might put a compulsory retirement plan into effect if no restriction in the contract and if in conformity with established policy. To the same effect, is Sandia Company, 27 LA 669.

Another interesting arbitration decision is that of Louisville Public Warehouse, 29 LA 128. There it was held that a discharge for age was not permitted where the contract prohibited "discharge except for cause". This decision enunciated the ruling that the management had the authority to discharge because of *inability*, and said the employer had the sole right to determine whether an employee was capable, so long as determination was not arbitrary, capricious or discriminatory. Transworld Airlines, Inc., 31 LA 45 held definitely that retirement for age contravened the seniority provision, and cited Nichols v. National Tube Co., D.C., 122 F.Supp. 726, which case was later reversed in United States Steel v. Nichols, 6 Cir., 229 F.2d 396. The Transworld case attached significance to the contract clause that older employees should be given lighter work.

In Hale Brothers Stores, 32 LA 713, the arbitrator quoted the Court of Appeals decision in United States Steel v. Nichols, 6 Cir., 229 F.2d 396, at page 400, and approved of the wording which stated in effect that instead of searching for a provision in the contract authorizing termination, the court should look to see if the same were prohibited. The arbitrator remarked that "the reserved rights theory expounded by the Circuit Court is perfectly orthodox arbitration doctrine." This arbitrator held that the introduction of an involuntary retirement plan because of age only, where no established plan had been in effect violated employment security, but did not refer to a particular clause in the contract.

In Western Air Lines, 33 LA 84, 87, the arbitrator held that retirement was not covered under the heading of seniority; that there was nothing in the agreement between the union and the employer to prohibit forcing a pilot to retire at age 60, and a common law right to manage its affairs furnished a proper basis for such action of the employer.

Brotherhood of Railroad Trainmen et al., 206 F.2d 9, 13, that "seniority among railway workers is * * * contractual and it does not arise from mere employment and is not an inherent, natural or constitutional right." See also, Ford Motor Co. v. Huffman, 345 U.S. 330, 337–339, 73 S.Ct. 681, 97 L.Ed. 1048; Aeronautical Industrial District Lodge 727 v. Campbell, 337 U.S. 521, 526–527, 69 S.Ct. 1287, 93 L.Ed. 1513; Trailmobile Co. v. Whirls, 331 U.S. 40, 52–54, 67 S.Ct. 982, 91 L.Ed. 1328; N. L. R. B. v. International Assoc. of Machinists, 9 Cir., 279 F.2d 761, 765; McMullans v. Kansas O. & G. Ry., 10 Cir., 229 F.2d 50, 53.

■ We have no difficulty in ascertaining the meaning of "seniority" as it appears in this Agreement, and our interpretation is in accord with that of many reported opinions. Seniority, as it applies to trainmen, means: "the oldest man in point of service (*ability and fitness for the job being sufficient*) is given the choice of jobs, is the first promoted within the range of jobs subject to seniority, and is the last laid off. It proceeds so on down the line to the youngest in point of service." Dooley v. Lehigh Valley R. Co. of Penna., 130 N.J.Eq. 75, 21 A.2d 334, 335, affirmed per curiam, 131 N.J.Eq. 468, 25 A.2d 893. (Emphasis supplied.) (See also Siaskiewicz v. General Electric Co., 2 Cir., 166 F.2d 463, 465; Fine v. Pratt, Tex.Civ.App., 150 S. W.2d 308, 311, an oft cited decision; Order of Railway Conductors of America v. Shaw, 189 Okl. 665, 119 P.2d 549.

In Goodin v. Clinchfield Railroad, etc., D.C., 125 F.Supp. 441, affirmed (per curiam) 6 Cir., 229 F.2d 578, certiorari denied 351 U.S. 953, 76 S.Ct. 850, 100 L. Ed. 1476, the question was whether the action of the union and the employer in agreeing to add a compulsory retirement clause to the contract contravened the employees' rights under the contract, including seniority rights, and the District Court stated, 125 F.Supp. at page 448:

"If the Railroad through Union contract surrenders its right to terminate plaintiffs' employment at an age of its own choosing and accepts seventy as the termination age, this is no more than an implied agreement by the Railroad to continue the employment of conductors and trainmen until they reach seventy before terminating because of age. Without the contract the employer could terminate them at any time. A collective bargaining agreement upon age seventy as the termination age is not an abridgement of any right of the employee but only an abridgement of the employer's right."

The opinion in United Protective Workers of America v. Ford Motor Co., 7 Cir., 194 F.2d 997, 1002, to which we shall refer later in another connection, held compulsory retirement of an employee did not violate the seniority provisions of the contract because such retirement was not a "lay-off".

In Held v. American Linen Supply, 6 Utah 2d 106, 307 P.2d 210, 212, the Supreme Court of Utah, citing Fine v. Pratt, Tex.Civ.App., 150 S.W.2d 308, said:

"The right of seniority as hereinbefore defined is not inconsistent with the right of an employer to discharge his employee. A right of seniority, as we think, [of it] exists upon the assumption of a continuing employment. It is superimposed upon the status of employer and employee."

■ We turn now to the provision of the Agreement between petitioner's Union and the Railroad which has to do with discharge, Article 47, headed "Investigations". We find wording that "no engineer shall be suspended or discharged except in *serious cases* where *fault* is apparent without a fair and impartial hearing." (Emphasis supplied.) We note the engineer is entitled to select an engineer in his same seniority district to represent him, or the regularly constituted committee of the Brotherhood of Locomotive Engineers can appeal through the proper officials to the highest authority; when a formal investiga-

tion is held, the engineer is entitled to representation by his Local (union) or any employee in his seniority district; the Superintendent or his representative may interrogate as may the engineer and his representative. We note also the following wording: "Where *charges* are made regarding engineers, same must be in writing. No *demerits* will be charged against the engineer's record without giving him an opportunity for *defense* and allowing him to present his side of the case, and finally, (Section 1(d) ):

"If an engineer is suspended or discharged and is proven to have been *innocent of the offense charged,* he shall be reinstated and paid $8.79 per day for time lost on such account." (Emphasis supplied.)

We have been able to discover only one reported judicial decision, where a situation is presented in any way similar to the one before us.

In Wilburn v. Missouri-Kansas-Texas R. Co. of Texas, Tex.Civ.App., 268 S.W. 2d 726, the railroad employee sued in the state court for damages for wrongful discharge. He said that he had been examined by the company doctor, told he was physically disqualified and removed from work on the railroad. He maintained he was entitled to an examination by a Board of Doctors (to be appointed in the same manner as decreed by the Railroad Adjustment Board in this case) and that he was refused such examination, and that the refusal and his consequent discharge constituted a breach of the collective bargaining agreement. He pleaded a portion of the agreement, Rule 81(a) which read that no employee should be discharged or suspended without *just and sufficient cause* without being given an investigation, hearing, witnesses, etc. "and if found not *guilty*"

(emphasis supplied) he should be reinstated with back pay.

The Court noted that the employee received notice of his removal from work in February of 1950, and that a provision regarding the employees' right to an examination by a Board of Doctors was not added to the collective bargaining agreement until April of 1950. In speaking of Rule 81(a) of the Agreement, the Texas Court observed that applicant's tenure of employment would have been "at will" except for said Rule relating to wrongful discharge, and that such a provision bore no relation to a removal from service because of physical disqualification, but had to do with disciplinary measures. In holding that the plaintiff had no cause of action for wrongful discharge under the Agreement as it stood when he was disqualified, the Court stated at page 734 of 268 S.W.2d:

"There is a wide difference between a discharge because of affirmative action and a disqualification on account of physical disability as expressed in the contract which has been plead[ed] by [the] plaintiff."[9]

We have read carefully the two cases entitled United Protective Workers of America v. Ford Motor Company, 7 Cir., 194 F.2d 997 and 7 Cir., 223 F.2d 49. We have likewise studied the decision in United States Steel Corp. v. Nichols, 6 Cir., 229 F.2d 396, 56 A.L.R.2d 980 (reversing Nichols v. National Tube Co., D.C., 122 F.Supp. 726.) where some attention was given to established practice of the industry. We do not view these cases as authority that we should consider custom and practice in this case. These decisions deal with compulsory retirement because of age only, refer to "just cause" provisions in the contracts, and do not indicate these contracts contained wording such as in the

9. In commenting upon the addition to the collective bargaining agreement of the clause providing for the appointment of a board of physicians, the Court further observed: "This, in our opinion, is a matter that should be properly left for negotiation between carrier and its employees, if such an arrangement is to be deemed desirable. *We do know that the general principle of recognizing in carrier the clear right to establish certain physical standards that all employees must meet is well established * * *"* (Emphasis supplied.)

Agreement before us. It is true that here, as in the three cases just cited, the employee's service was terminated just as effectively by retirement as by discharge, but the contracts appear to be different, and as was said in the Nichols case (6 Cir., 229 F.2d 396, 402) " * * * in dealing with rights and obligations under a written instrument we cannot ignore distinctions expressly made by the wording of the instrument merely because the end result is the same".

The Agreement before us does not state that if an employee is discharged without "just cause" he is to be reinstated. It says if he "is found innocent of the offense charged" he must be reinstated. This phrase and the other words we have emphasized "fault", "charges", "demerits", "defense" show that a "derogatory type of discharge" because of violation of a rule made for, or commission of an act detrimental to, the good of the service is contemplated. To apply these terms to an obviously upright and faithful employee such as petitioner would be inconceivable.

We hold that the seniority and discharge clauses of the Agreement are unambiguous, do not require the introduction of oral testimony in aid of their interpretation and do not, either singly or jointly, prohibit the retirement of an employee deemed physically disqualified by his employer to perform the duties of his position.

It is plainly indicated that by the seniority and discharge clauses we have discussed the defendant surrendered a portion of its common law right to manage its business as it saw fit. We think it is necessary for us to decide if, by the act of entering into a collective bargaining agreement, other management rights became affected, though not adverted to in the contract. This calls for a consideration, we believe of the "residual" or reserved rights theory: that management remains free to control its business except as limited by the collective bargaining contract.[10]

We find early enunciation by the courts supporting the "residual rights" theory in collective bargaining under the Rail-

10. Eminent writers have discussed this subject frequently:

In the February, 1961 issue of the Labor Law Journal (Vol. 12, No. 2, p. 167) Frank R. DeVyver, Chairman of the Department of Economics and Business Administration at Duke University, Durham, North Carolina, said:

"American employers are bound by a collective bargaining agreement which runs for some fixed term. Under these agreements, management remains free to lay off workers, add shifts, remove shifts, and change the methods, processes and materials of work—subject only to the protection of the rights of workers contained in the agreement."

Gerald D. Reilly, 1957 Vice-Chairman of the American Bar Association Labor Law Section, in Labor Law Review, January, 1957 Vol. 8, No. 1, 19 at 23, observed:

"Most lawyers conceive, and I think correctly—of a collective bargaining agreement as limiting management's discretion only in respect to such matters affecting employer-employee relationships as are specifically touched upon in the contract. This theory of residual rights, however, has not been universally accepted by arbitrators."

Professor Cox, "Legal Nature of the Collective Bargaining Agreement", 57 Michigan Law Review, 1958, 1959, at p. 35 said, in discussing what he termed the "reserved rights view":

" * * * Most judges appear to adopt this position without qualifications, although few of them have felt impelled to state the doctrine squarely. Professor Gregory may overstate the case when he says that apart from its unpopularity with unions the doctrine is generally accepted, but I suspect a poll of arbitrators would give the doctrine a majority, provided that the ballot was secret. Furthermore, it is at least historically accurate to describe collective bargaining agreements as instruments by which the unions have gradually taken away the erstwhile prerogatives of management."

And on the question of whether custom and practice should be read into Agreements we note the following expressions:

In an article entitled "Reason, Contract and Law in Labor Relations", 68 Harvard Law Review, 1955, p. 999 at 1011, the late Dean Schulman stated he doubted if there were any general understanding among employers and unions about the "viability of existing practices during the term of a collective bargaining"

way Labor Act. We believe the first case in which a court construed the award of a Railroad Adjustment Board was Estes v. Union Terminal Co., 89 F.2d 768. There the learned Circuit Judge Hutcheson (5 Cir.) in a strong concurring opinion (at page 774), observed that the individual employees had no individual rights which they could press against the employer as to tenure or seniority apart from the test of the collective bargaining agreement, and subject to the agreement any of them could be let out at the will of the carrier.

Again referring to the opinion in the case of Goodin v. Clinchfield Railroad, supra (D.C., 125 F.Supp. 441, affirmed 6 Cir., 229 F.2d 578, certiorari denied 351 U.S. 953, 76 S.Ct. 850, 100 L.Ed. 1476) from which we have quoted when discussing seniority, we emphasize the phraseology which states that the acceptance of an employer of a compulsory retirement provision is a *surrender* of his right to terminate the employee at any time.

In Brotherhood of Ry. and S. S. Clerks, Freight Handlers, Exp. and Station Emp. v. Atlantic Coast Line R. Co., 2 Cir., 253 F.2d 753, 758, the National Railroad Adjustment Board ordered an employee reinstated who had been discharged because he allowed a photographer to come on railroad property and take pictures to be used against the company in a damage action. The Board held that because the employee had violated no rule of the agreement the discharge was arbitrary. The Court of Appeals sustained the lower court in refusing to enforce the Board's order and stated that the Board was "manifestly in error in holding that the discharge was wrongful merely because no rule of the current bargaining agreement had been violated."

Reviewing cases decided under the National Labor Relations Act we likewise find definite views that some of the inherent rights remain in the employer after the collective bargaining contract is executed.

In J. I. Case v. National Labor Relations Board, 321 U.S. 332, at page 335, 64 S.Ct. 576, 579, 88 L.Ed. 762, the Supreme Court remarked:

"After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hirings. The employer, except as restricted by the collective agreement itself and except that he must engage in no unfair labor practice or discrimination, is free to select those he will employ or discharge."

The Inland Steel decision, infra, 170 F.2d 247, at page 252, certiorari denied 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112, held that absent a retirement clause in the agreement (which already included seniority and discharge provisions) the Company could retire the employee at any age.

In United States Steel Corp. v. Nichols, supra, 6 Cir., 229 F.2d 396 at page 398 the Court of Appeals of the decision mentioned that the lower court was of the opinion that the employer could not with-

and was of the opinion that in many enterprises the execution of a collective agreement would be blocked if it were insisted in a broad provision that "all existing practices, except as modified by this agreement shall be continued for the life thereof" and that the execution would also be blocked if the converse provision were demanded.

In "The Duty to Bargain Collectively During the Term of an Existing Agreement," Harvard Law Review, 1950, Vol. 63, No. 7, p. 1097 stated at p. 1118 that the writers advocated a view of construction which would hold that the par-

ties to "a *comprehensive* collective bargaining agreement, in the absence of contrary evidence, are to be presumed to have executed the agreement upon the understanding that major conditions of employment not covered by the agreement would continue 'as they were' unless changed by mutual agreement". (Emphasis supplied.)

In the articles from which we have quoted Dean Schulman, Professor Cox and Professor Dunlop, they plainly were referring to collective bargaining agreements with arbitration clauses.

hold an employment right unless such withholding was recorded or reserved by the contract, and that there was no contractual right of the employer in the collective bargaining agreement which authorized him to compulsorily retire an employee because of age. In reversing the District Court, the Court of Appeals referred to N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, and stated that the common law right of an employer to select and hire employees and terminate employment was not inhibited by any statute applicable to the case before it, and ruled: (229 F.2d at page 399)

"* * * It would seem to logically follow that the common law right on the part of the employer to select his employees and to terminate their employment at will continues to exist except to the extent that it may be modified by the bargaining contract with the Union. Instead of making this right dependent upon a provision to that effect in the contract, it is a right which an employer normally has unless it has been eliminated or modified by the contract. Accordingly, we are not in agreement with what we construe to be the District Judge's conclusion of law that since there was no provision in the collective bargaining contract authorizing the termination of appellee's employment by reason of age, such right did not exist."

At another paragraph on the same page we find the following language:

"* * * Although it may be the theory of the law that collective bargaining may at times or eventually accomplish that result, the express language of the Labor-Management Relations Act, Sec. 158(d), Title 29, U.S.C.A., and the authorities above referred to make it clear that a collective bargaining agreement does not necessarily express the full coverage of employment rights. It covers such matters only as the parties may have been able to agree upon and leaves unresolved such issues as the parties may not have been able to agree upon and with respect to which the law does not require a concession by either party."

The Court of Appeals felt it necessary to determine from a consideration of the contract whether termination because of age was prohibited instead of searching for a provision authorizing it, and observed at page 400 of 229 F.2d:

"This requires the application of the usual rules involved in the construction of a written instrument."

In N. L. R. B. v. Nash-Finch Co., 8 Cir., 211 F.2d 622, 45 A.L.R.2d 683, a case cited in the Nichols case as sanctioning the application of the usual principles of contract construction, the employer, after a collective bargaining contract had been executed, terminated certain insurance and Christmas bonus benefits. The Court of Appeals (Judge Sanborn speaking) refused to sustain the finding of the National Labor Relations Board that the employer had committed an unfair labor practice and in setting aside the Board's order said: (at page 626)

"Where parties to a contract have deliberately and voluntarily put their engagement in writing in such terms as import a legal obligation without uncertainty as to the object or extent of such engagement, it is conclusively presumed that the entire engagement of the parties and the extent and manner of their undertaking have been reduced to writing. Ford v. Luria Steel & Trading Corp., 8 Cir., 192 F.2d 880, 884 and cases cited.

"The following language from Printing &c. Co. v. Sampson, L.R. 19 Eq. 462, 465, has several times been approved by the Supreme Court of the United States: '* * * if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the ut-

most liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice.' See Baltimore & Ohio S. W. R. Co. v. Voight, 176 U. S. 498, 505, 20 S.Ct. 385, 387, 44 L.Ed. 560; Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 356, 51 S.Ct. 476, 75 L.Ed. 1112."

In addition to subscribing to the familiar principles of contract law announced in the Nash-Finch and Nichols cases just discussed, we find that other principles of the law of contracts apply. In Atlantic Coast Line Railway Company v. Brotherhood, 4 Cir., 210 F.2d 812, 813, the Court observed that collective bargaining agreements like other contracts are to be given a reasonable construction, not one which results in injustice and absurdity, and the Court in Virginian Railway Co. v. System Federation No. 40, 4 Cir., 131 F.2d 840, 842 counsels that collective bargaining agreements be given a realistic interpretation. It would indeed be "unrealistic and absurd" to hold that if an engineer did not wish to retire he might keep his hand on the throttle during the remainder of his lifetime.

Another principle which we find applicable here is that an exception to what is normally included in a particular type of a contract should be, and usually is, spelled out with such clarity that there can be no doubt as to its meaning. Sigfred v. Pan America etc., 5 Cir., 230 F.2d 13, 18. A provision restricting an employer's right to retire an employee because of age or physical disqualification, would have been an exception in the era in which this Agreement was negotiated, the year 1935. This, because the first authoritative ruling placing compulsory retirement among the subjects upon which the Act permitted collective bargaining, and holding that the employer was at least required to discuss such a matter with the union, was the decision, in 1948, in Inland Steel Co. v. National Labor Relations Board, supra, 170 F.2d 247, 12 A.L.R.2d 247, certiorari denied 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112.

In this case the Court stated that seniority and discharge provisions had long been accepted as matters for negotiation. And, as late as 1956 we find able-bodied engineers over 70 contending that a compulsory retirement provision at age 70 which the union and the employer had added to the agreement was not properly a subject for collective bargaining. McMullans v. Kansas, Oklahoma & Gulf Railway, 10 Cir., 229 F.2d 50, certiorari denied 351 U.S. 918, 76 S.Ct. 710, 100 L.Ed. 1450. See also Goodin v. Clinchfield, etc. D.C., 125 F.Supp. 441, affirmed 6 Cir., 229 F.2d 578, certiorari denied 351 U.S. 953, 76 S.Ct. 850, 100 L.Ed. 1476.

Finally, it appears to this Court that there is language in the opinion in United Steelworkers of America v. Warrior & Gulf Co., 1960, 363 U.S. 574, at page 583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409, which supports the theory that rights of the employer not treated in the contract are left for the employer to exercise, at least where a "bare-bone" contract such as the Agreement here is presented.

"Collective bargaining agreements regulate or restrict the exercise of management functions; they do not oust management from the performance of them. Management hires and fires, pays and promotes, supervises and plans. All these are part of its function, and absent a collective bargaining agreement, it may be exercised freely except as limited by public law and by the willingness of employees to work under the particular[ly], unilaterally imposed conditions. *A collective bargaining agreement may treat only with certain specific practices, leaving the rest to management but subject to the possibility of work stoppages.* When, however, an absolute no-strike clause is included in the agreement, then in a very real sense everything that management does is subject to the agreement, for either management is prohibited or limited in the action it takes, or if not, it is protected from interference by strikes." (Emphasis supplied.)

■ Accordingly, we hold that the right of the carrier to terminate the employment of its workers, except as prohibited by statute, remains with such carrier to the extent not surrendered by the terms of a collective bargaining agreement, and that the extent of such surrender is to be determined by the plain words of the agreement under the rules governing the interpretation of contracts.

The carrier here exercised a right which it had not surrendered by the act of executing a collective bargaining agreement, or by virtue of its terms.

■ There is another principle of contract interpretation which applies to collective bargaining agreements. A right of termination which remains with the employer has attached to it his implied covenant not to use it in bad faith and unfair dealing to destroy or injure the employee's right to the fruits of the contract. See Williston, Contracts, Rev. Ed.1936, Section 670; Cox, "Legal Nature of Collective Bargaining Agreements", University of Michigan Law Review, Nov. 1958, Vol. 57, No. 1, pp. 1, 17.

It is in some of the cases where a bad motive or unfair dealing with intent to frustrate rights under the agreement is charged that we find evidence of custom and usage in plant and industry, established practices and so on, introduced either to establish unfair motive or to refute the existence of it. This is especially true of cases under the National Labor Relations Act.[11]

Here no bad faith motive or unfair dealing was charged in the complaint, and none was found by the Railroad Adjustment Board. In fact, from the record before the Board as the same is set out in the findings (we refer both to the first, or conditional award and the second or final award) the contrary appears. This, especially, considering the known fact that the operation of a train is an exacting task, a dangerous and hazardous business, (Chicago & A. R. Co. v. United States, 247 U.S. 197, 38 S.Ct. 442, 62 L. Ed. 1066; Atchison R. Co. v. United States, 244 U.S. 336, 37 S.Ct. 635, 61 L. Ed. 1175) that the carrier is chargeable with the utmost care and diligence [12] that the petitioner had been twice examined by the carrier's physicians and twice found disqualified, and that it cannot be said the retirement of a 70 year old engineer is not directly related to the safety of the public, whether he is physically disqualified or not. Goodin v. Clinchfield, supra, D.C. 125 F.Supp. 441 affirmed per curiam, 6 Cir., 229 F.2d 578, certiorari denied 351 U.S. 953, 76 S.Ct. 850, 100 L. Ed. 1476.

We are able to accord prima facie weight to all findings of fact of the Board which are here material—that is, when it is possible to separate such findings from conclusions of law.[13] But a Rail-

11. United Protective Workers of America v. Ford Motor Co., 7 Cir., 194 F.2d 997, 1003; N. L. R. B. v. Adkins Transfer Co., 6 Cir., 226 F.2d 324, 325; N. L. R. B. v. McGahey, 5 Cir., 233 F.2d 406, 411; United States Steel Corp. v. Nichols, 6 Cir., 229 F.2d 396, 402.

12. In Minneapolis & Ry. Co. v. Rock, 279 U.S. 410, 414, 49 S.Ct. 363, 365, 73 L.Ed. 766, the Supreme Court said:

"The carriers owe a duty to their patrons as well as to those engaged in the operation of their railroads to take care to employ only those who are careful and competent to do the work assigned to them and to exclude the unfit from their service. The enforcement of the act is calculated to stimulate them to [the] proper performance of that duty.

Petitioner had a right to require applicants for work on its railroad to pass appropriate physical examinations."

In Ford v. Carew & English, 89 Cal. App.2d 199, 200 P.2d 828, 830 (hearing denied) the statement of facts showed that a 67 year old driver for a limousine carrier of passengers lost consciousness at the wheel and crashed into a light standard. The evidence showed that he possibly suffered from "strained heart muscles". The Court held that whether the defendants had reason to anticipate such an attack was a question for the jury.

13. There is no conflict between the Board's findings as to material facts and those alleged in the pleadings and affidavits on file in this case.

road Adjustment Board must operate on jurisdictional tracks, laid out by statute, their scope reaching only so far as the limits of the Agreement. If a derailment occurs, the order or award is unenforceable.[14]

The Board should have interpreted the Agreement as we have done here, and should have dismissed the claim prior to making its first, or conditional award.

Instead, it proceeded to construe its jurisdiction erroneously, in view of the Agreement as it then stood. Then it proceeded to set up a board of physicians to make its decision for it, a procedure not consonant with a "desirable degree of uniformity" among Railroad Adjustment Boards, a procedure without a shred of sanction from contract or statute.[15]

In such a situation, we do not think there is represented the type of adminis-

trative construction to which we are required to make judicial obeisance.[16]

It is possible the Board was actuated by a desire to perform a public service, and a procedure similar to that it prescribed was, as we have mentioned, several years later incorporated into the Agreement through collective bargaining under the provisions of the statute relating to change of contract. Such change did not have a retroactive effect.

It is desirable to settle controversies on the basis and within the confines of existing contracts wherever possible, instead of compelling resort to the machinery provided by statute for changing collective bargaining agreements. This principle has been established, probably because those construing the agreement feel that when all is quiet on the labor front there is no use risking hostility at the bargaining table. Manage-

---

14. Thomas v. New York, Chicago & St. Louis R. Co., 6 Cir., 185 F.2d 614, 617:
    " * * * While the Board under the statute has jurisdiction to hear an individual grievance, it is not authorized to write a contract for the parties nor to create substantive legal rights."

15. There are many decisions construing action of a National Labor Relations Board whose general effect may be applied to a Railroad Adjustment Board: N. L. R. B. v. Union Pacific Stages, 9 Cir., 99 F.2d 153, 177 (Judge Garrecht), the Act is not intended to empower the Board to substitute its judgment for that of the employer in the conduct of his business; Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F.2d 624: Board in protecting employee and promoting industrial peace must likewise be mindful of the welfare of the honest employer; N. L. R. B. v. Nash-Finch, 8 Cir., 211 F.2d 622, 627, 45 A.L.R.2d 683: Board cannot bestow upon union employees the benefits which it believes the union should have obtained but failed to obtain for them as a result of its collective bargaining with employer; N. L. R. B. v. McGahey, 5 Cir., 233 F.2d 406, 413: Board cannot "second-guess" management or give it gentle guidance by over-the-shoulder supervision; N. L. R. B. v. Lewin-Mathes Co., 7 Cir., 285 F.2d 329, 333: Board should not use its functions to endeavor to compel concessions at the bargaining table.

16. Attached to defendant's brief is a copy of a decision of Special Adjustment Board No. 18, July 22, 1959, Thomas J. Mabry, Chairman and Neutral Member. The Order of Railway Conductors (on behalf of brakeman O. F. Lemon) and the Southern Pacific Company were parties to the dispute. In its opinion, the Board cited 7 decisions of the First Division, and 3 from other Divisions in support of its holding that the Board lacked authority, absent a provision in the contract, to pass upon the physical fitness of a railroad man disqualified by the Company physicians, or to set up a board of independent physicians for such purpose. The Special Adjustment Board No. 18 also cited Thomas v. New York, Chicago & St. L. R. R., 6 Cir., 185 F.2d 614, 617 and Hunter v. Atchison T. & S. F. Ry. Co., 7 Cir., 171 F.2d 594, and stated that under the agreement as it was written at the time, the carrier's physicians must make the determination as to fitness for service.
    This well reasoned decision demonstrates that the Board in the instant case was incorrect in its statement that "it had been consistently held" that it had jurisdiction to determine whether the employee had wrongfully been deprived of service, and also demonstrates a lack of uniformity of administrative construction as to jurisdiction to determine fitness and as to authority to set up an independent board of physicians for such purpose.

ment and unions may also feel reluctance, for once negotiations are started about a new clause, management may ask the relinquishment of a right already conceded, or labor make other demands.

A purpose of the Act, however, is to encourage collective bargaining. Just as a garment may become too short or too small to cover a growing child, so may a bargaining agreement fail to meet requirements of both labor and management as the years go by. A wise tailor knows that a garment may be stretched just so far without weakening the fabric or pulling it apart at the seams, and he will add a new piece of material rather than ruin the entire garment.

Neither the Board nor this Court could stretch this 1935 bargaining agreement to cover the situation which arose in 1954. A new piece, but from the material of employer's residual rights, had to be added. That the employer chose to relinquish the material, and what the result will be of allowing others than itself to determine the fitness of engineers to handle the dangerous instrumentalities of its locomotives, is not for the consideration of this Court in this particular litigation. Neither the Court nor the Board could be the tailor who added the material. The task belonged to labor and management.

The record before us shows there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Rule 56, Rules of Civil Procedure, 28 U.S.C.A.

The award and order of the Railroad Adjustment Board should not be enforced.

### Appendix.

### Exhibit A

"Statement of Claim: Request for reinstatement of Engineer F. J. Gunther to service with all seniority rights unimpaired and pay for all time lost account of physical disqualified and taken out of service December 30, 1954.

"Findings: The First Division of the National Railroad Adjustment Board, upon the whole record and all the evidence, finds that the parties herein are carrier and employe within the meaning of the Railway Labor Act, as amended, and that this Division has jurisdiction.

"Hearing was waived.

"Claim of engineer for reinstatement in service and pay for time lost. Shortly after his 71st birthday claimant was disqualified from service by the chief surgeon on the basis of a physical examination by a company physician at Los Angeles. Upon his request he was then sent to the Southern Pacific General Hospital at San Francisco and there examined by carrier's medical superintendent following which the chief surgeon determined that he should not be returned to service.

"Thereupon claimant went for examination to a recognized specialist at San Diego and on the basis of his report requested that a three doctor board be appointed to reexamine his physical qualification for return to service.

"Upon denial of this request claim for reinstatement and back pay was filed in this Division resulting in Award 17 161 in which the claim was dismissed without prejudice on the ground that there was no showing whether or not claimant's physician and the company physicians disagreed as to claimant's physical qualifications. Now the claim has been progressed again with the inclusion of further statement by claimant's physician.

"Carrier contends that notwithstanding such statement or any disagreement there is no rule permitting the appointment of a neutral medical board as here sought and that the decision of the chief surgeon that claimant is not physically qualified for service is not subject to review.

"It is true that carrier has the right and responsibility of determining within proper limits the physical fitness of employee to remain in service. It is true also that the employe has the right to

priority in service according to his seniority and pursuant to the agreement so long as he is physically qualified. Where these two rights come into collision it has consistently been held by this Division that it has jurisdiction to determine whether the employe has wrongfully been deprived of service.

"If carrier through its medical staff has removed an employe from service in good faith, on the basis of a fair standard of fitness, applied to his physical condition, adequately determined, there is no right to reinstatement. Otherwise he has been wrongfully removed from service.

"Since determination of the facts necessary to enable the Division to make proper award on such issue requires expert medical competence, it has not been unusual, where adequate showing has been made of ground for challenge of carrier's decision, for the Division to provide for a neutral board of three qualified physicians, one chosen by carrier and one by the employe and the third by the two so selected, for the purpose of determining the facts as to a claimant's disability and the propriety of his removal from service. In such case the Division predicates its award upon the finding of the board of physicians.

"While the statement of claimant's physician now submitted is generally equivocal we think that when considered in connection with his prior report and that of carrier's medical superintendent, it discloses sufficient substantial disagreement as to claimant's physical condition to justify further check up and inquiry by such a neutral board of physicians.

"If the decision of the majority of such board shall support the decision of carrier's chief surgeon the claim will be denied; if not, it will be sustained with pay pursuant to rule on the property from October 15, 1955, the date of the letter of Dr. Hall showing disagreement with the findings of disqualification by the company physicians.

"Award: Claim disposed of per Findings.
"Dated at Chicago, Illinois this 2nd day of October, 1956."

### Exhibit B

### "Interpretation

"This docket presents claim previously before this Division with the present Referee sitting as a Member, which resulted in Award 17 646. As appears therein claimant had been held by carrier's chief surgeon to be no longer physically qualified to remain in service and the Division determined that there was sufficient disagreement as to claimant's physical condition to justify inquiry and finding by a board of three physicians, as not unusually required. It was declared that if the decision of the majority of such board should support the decision of carrier's chief surgeon the claim would be denied; if not, it would be sustained with pay pursuant to rule on the property, from October 15, 1955.

"On June 30, 1958 claimant filed with the Division a supplemental submission setting out that following said award a board of three physicians had been agreed on and established as provided for therein, and that the findings and decision of the majority of said board did not support the decision of carrier's chief surgeon but found that claimant had no physical defect which would prevent him from carrying on his usual occupation, but that carrier advised claimant that "the findings of the three doctor board have been reviewed by the chief surgeon and interpreted to be such that you should not be returned to duty", and refused to reinstate claimant or pay him for time lost. Wherefore claimant sought a new or supplemental award or an interpretation, to make absolute his right to reinstatement and pay for time lost.

"Carrier now requests permission to file an answer to petitioner's submission and asserts that the Referee has authority to resolve any question of procedure in the matter before him. Claimant's

submission was filed more than ninety days before the request without any request appearing for extension of time. In the meantime the Division deadlocked on the disposition of the dispute and it was submitted to the National Mediation Board which appointed a Referee; then the docket was given the Referee for study and thereafter on the day the matter came on for oral argument carrier made its request for permission to file answer. Even then no answer was tendered or time suggested when one might be prepared. In such situation, if the Referee has such authority as urged by carrier representatives permission would be denied.

"We find from the record that the statements set out in claimant's submission are true; that a board of three physicians was selected by agreement of the parties for the purpose of determining claimant's physical qualification for service; that the majority of said board properly examined claimant and that their findings and decision therefrom did not support the decision of carrier's chief surgeon but that they found and decided that claimant had no physical defects which would prevent him from carrying on his usual occupation as engineer.

"The issue of fact upon which the prior Award 17 646 was conditioned having been determined in favor of claimant, said conditional award should be made absolute and final and the claim sustained as therein provided.

"Award: Claim sustained for reinstatement with pay for all time lost from October 15, 1955 pursuant to rule on the property.

"Dated at Chicago, Illinois this 8th day of October, 1958."

"Article 35.

"Seniority.

"Section 1. Rights of engineers shall be governed by seniority in service of the Company as engineers and seniority of the engineer as herein defined shall date from first service as engineer.

"Sec. 2. Under consolidation of the San Diego & Arizona Railway and the San Diego and Southeastern Railway all engineers retain their seniority over lines on which they were employed prior to January 1st, 1918. Their system seniority will date from January 1st, 1918, date of consolidation.

"Sec. 3. (a) The Company will not assign any more engineers to each district or run than is necessary to move the traffic with promptness.

"(b) Where there is a surplus of engineers for the business of the district, the oldest engineer in point of seniority shall have the preference for employment. * * *"

"Article 38.

"Reduction of Force.

"Section 1. (a) When, from any cause, it becomes necessary to reduce the number of engineers on the engineers' working list, those taken off, may, if they so elect, displace any fireman their junior on their seniority district.

"Engineers Cut Off List.

'(b) When hired engineers are laid off account of reduction in service, they will retain all seniority rights; provided they return to actual service within thirty days from the date their services are required."

"Article 47.

"Investigations.

"Section 1. (a) No engineer shall be suspended or discharged, except in serious cases, where fault is apparent beyond reasonable doubt, until he has had a fair and impartial hearing before the proper officials. During such hearing he may be assisted by an engineer in service on his seniority district. When decision is rendered, if such engineer believes it unjust, he may take up his own case on appeal to the higher authorities and, if he so desires, may select an engineer in service on the same seniority district to assist him in presenting his case, but such representation shall be of a purely personal character, and shall not carry with it the sanction of committee repre-

sentation. No adjustment made by the Company in such cases shall be construed or cited as precedent in any case presented by the Engineers' Committee.

"(b) If an engineer does not handle his own case, as above specified, the regularly constituted committee of the Brotherhood of Locomotive Engineers can appeal through the proper officials to the highest authority; hearing in all cases to be given and decision rendered promptly as possible.

"(c) In all cases where a formal investigation is held, the engineer under investigation will be entitled to representation by the Local Chairman of his organization or by any employe of the same grade in actual service on the engineer's seniority district.

"Interrogations will be made by the Superintendent or his representative who is holding the investigation. After he has completed the direct examination, officers of the Company who may be attending the investigation will be allowed to interrogate the witness.

"If the engineer's representative desires to ask any questions pertaining to the case of the man represented, he will be allowed that privilege.

"Where charges are made regarding engineers, same must be in writing.

"No demerits will be charged against an engineer's record without giving him an opportunity for defense and allowing him to present his side of the case.

"If the Chairman of the Local Committee requests a transcript of the testimony in an investigation that has been made, it will be furnished.

"Note: It is understood the above rules cannot be construed to have been properly observed unless the engineer and/or his representative are confronted with all the charges and evidence and provided with a copy of transcript of all evidence.

"Section 1(d) If an engineer is suspended or discharged and is proven to have been innocent of the offense charged, he shall be reinstated and paid $8.79 per day for time lost on such account."